NASHVILLE, C. & ST. L. RY. v. HARRELL (two cases).—110 S. W. (2d), 1032.

Middle Section.   October 2, 1937.

Petition for Certiorari denied by Supreme Court, December 17, 1937.

Kingree & Kingree, of Shelbyville, and Walton Whitwell, of Nashville, for plaintiff in error railway.

Wm. H. Swiggart, Frank Slemons, and W. A. Miller, all of Nashville, for plaintiff in error.

Zach T. Carney, of Shelbyville, for defendants in error.

FAW, P. J.  Two cases, brought and docketed separately, were, by consent, tried together in the circuit court of Bedford county, and have been brought to this court in one transcript, with a single bill of exceptions, and docketed and tried here under the above style.

One of the cases is an action brought by F. J. Harrell, Jr., a minor, suing by his father, F. J. Harrell, as next friend, against the Nashville, Chattanooga & St. Louis Railway, to recover damages for personal injuries which, he avers, he suffered as the proximate result of negligence of the defendant railway.

The other of the two cases is an action by F. J. Harrell against the same defendant to recover for the expenses incurred in the necessary care and treatment of his said minor son, and for the loss

of his said son's services, all of which, he avers, was proximately caused by negligence of the defendant railway.

■ Although tried together to a jury, such joint trial did not operate as a technical consolidation of the two cases, and separate verdicts and judgments were rendered, separate motions for a new trial were made and overruled, and separate appeals in error were prayed and granted, in the two cases below.

In each case the defendant railway filed a plea of not guilty to the plaintiff's declaration, and the cases were tried upon the issues thus made. The jury found the issues in favor of the plaintiff in each case, and assessed the damages of F. J. Harrell, Jr., at $750, and the damages of F. J. Harrell at $500.

In this court, the railway has assigned errors upon matters which were included in its motions for new trial, overruled below. The first five assignments of error are the same in each case.

The trial judge overruled a motion made by the defendant, at the close of all the evidence, for a peremptory instruction in its favor, and, through its first assignment of error, the railway asserts that this was error.

The second assignment of error is that there was no evidence to support the verdict of the jury.

■ The third assignment is that the evidence preponderated against the verdict of the jury. This assignment (the third) presents no question which this court can consider in a jury case. Illinois Cent. R. Co. v. Abernathey, 106 Tenn., 722, 728, 64 S. W., 3.

■ The first and second assignments of error, supra, require a consideration of the evidence from the same viewpoint, for if there was no evidence to support the verdict, there was no evidence which would justify the submission of the case to the jury.

For the convenience of statement, we will designate the parties in each case as plaintiff and defendant, as they appeared on the record below; and (as F. J. Harrell has no right of action for expenses and the loss of his son's services unless there is material evidence to support the action of F. J. Harrell, Jr.), whenever we refer herein to the plaintiff, without more, F. J. Harrell, Jr., is intended.

During the period covered by the occurrences disclosed by the evidence in these cases, the defendant railway operated a mixed freight and passenger train between the towns of Wartrace and Shelbyville in this state; a distance of eight miles. The accommodations for passengers consisted of a single coach at the rear of the train, which coach was divided by a partition into two compartments; the rear compartment for white passengers, and the front compartment for colored passengers. At the rear of the passenger coach there was a platform, with steps, by means of which white passengers reached a door through which they entered the white compartment when boarding the train and made their exit when leaving it. There was a

"trap door" which could be lowered so as to prevent the use of the steps to the platform while the trap door was down, but this trap door was seldom lowered, and it was not down on the day of the accident involved in this case. There is nothing in the record which indicates that the door, platform, and steps were materially different from those commonly seen on railroad day coaches in use in Tennessee now and during recent decades.

The family of plaintiff F. J. Harrell consisted of his wife and one child (the minor plaintiff), and his home was near a "flag station" known as Coldwell, on, defendant's said railroad between Wartrace and Shelbyville.

On February 12, 1936, the plaintiff (F. J. Harrell, Jr.) "jumped" from the rear platform of the coach above described to the ground, while he was a passenger thereon, and at a time when the train was moving at a speed variously estimated by the witnesses at 25 to 35 miles an hour, and, as a result thereof, he suffered the injuries for which he sued in this case. Plaintiff was born on March 14, 1927, and "lacked one month and two days" of being nine years of age when he was thus injured.

Plaintiff was at that time, and had been since September, 1935, a pupil at Holly Grove School, which was near Gray's Crossing, a station on defendant's road between Coldwell and Shelbyville. His teacher at Holly Grove School was Miss Blair Allen, who lived at Wartrace, and who was accustomed to ride from Gray's Crossing to Wartrace on defendant's train each afternoon on school days. During several weeks prior to the time he was injured as aforesaid, plaintiff had been riding from his home to Holly Grove School each morning in a "milk truck" and returning to Coldwell each afternoon on defendant's train. It was plaintiff's custom to board the train at Gray's Crossing in company with his teacher, Miss Allen, sit with Miss Allen in the white compartment of the coach at the rear of the train, and alight from the train at Coldwell. It was the uniform custom of the conductor to help plaintiff on and off the train each afternoon when plaintiff was a passenger thereon. The same man (I. H. Woodruff) was in charge of the Wartrace-Shelbyville train as conductor each day. He was 68 years of age, had been in the service of defendant railway for 51 years, and had been conductor of the Wartrace-Shelbyville train since the year of 1933.

On the day plaintiff was injured as aforesaid, he boarded the train at Gray's Crossing a few minutes before 3 o'clock p. m., accompanied by his teacher, Miss Allen, and her father, W. J. Allen (city recorder at Wartrace), and they seated themselves near the rear of the white compartment of the coach, on two seats thrown together; that is, the back of one seat was reversed and the plaintiff sat thereon facing Miss Allen and her father.

As the train was leaving Gray's Crossing, the conductor (Wood-

ruff) came through the white compartment collecting fares. Miss Allen and Mr. Allen paid the usual fare to Wartrace, and plaintiff handed the conductor a nickel, which was the correct fare (half-fare) for one of his age to Coldwell, and which was also the proper fare for him to pay to Wartrace. Thereupon, the conductor went into the colored compartment, where he had a desk, and busied himself with the preparation of his daily conductor's report to defendant railway, and where he remained until the train had passed Coldwell.

When the train had almost reached the usual stopping place at Coldwell, both plaintiff and Miss Allen realized that it was not stopping or slackening speed, and plaintiff left his seat and went to the rear platform of the coach, while Miss Allen went to the door of the colored compartment and called the attention of the conductor to the fact that the train was not stopping at Coldwell. The conductor immediately gave the "stop signal" by pulling the "conductor's valve" and the train then stopped promptly, but it was then discovered that plaintiff had jumped off the platform of the coach when it had passed a short distance beyond the usual stopping place at Coldwell, and was walking (or limping with much difficulty) along or near the track. The train was backed to Coldwell, and it was found that plaintiff's head was cut and bleeding, and his left leg was injured. He was taken on the train to Wartrace, and there, accompanied by Miss Allen, he was carried to the office of a physician.

In the discussion of defendant's first and second assignments of error, it is sufficient to say that plaintiff suffered substantial injuries. The character and extent of his injuries are involved in other assignments of error.

The plaintiff was an intelligent boy for one of his age. In school he was in the fourth grade, and he had "made his grades" every year. There is ample and undisputed proof that he was an unusually bright boy. He was evidently a boy of good judgment, and also well developed physically, for it appears from the testimony of his father and mother that he "laid off corn ground," "run a planter," and had "bursted the middles" out of twenty-five acres of corn twice during the year preceding his injury. He "could milk good for a boy of his size," and was accustomed to help get the cows up and do the milking at his home.

Plaintiff testified that when he left his seat in the coach as before stated, he knew that Miss Allen had gone back to tell the conductor to stop the train; that "before this day" the conductor would always help him off the train, and that he would always wait for the conductor to help him off; that he did not wait for the conductor to help him off on this occasion, but jumped off; that when he jumped off he knew the train was running fast, and that it was running about 35 miles an hour.

Plaintiff was asked to tell the court and jury what he did when the

train did not stop at Coldwell, and he replied: "Well, I was frightened. I went out to the platform, and the conductor wasn't out there, so I jumped off. The conductor wasn't out on the platform to flag it down so I just jumped off."

Again he was asked to tell the jury why he "jumped off the train that day," and he replied: "Because they were carrying me on to Wartrace, and I wanted to come home to mother and daddy."

Plaintiff's father had told him not to try to get on or off a train if it was moving, and he "felt like" plaintiff understood him. Plaintiff's mother also testified that she had told plaintiff several times to not try to get on or off a train "unless it was stopped," and that plaintiff understood what she was talking about and "knew it was dangerous to get off the train while it was running."

It will be remembered that Coldwell was a "flag station," and the failure of the engineer to stop the train there was due to the failure of the conductor to give the engineer a signal to stop. If there was negligence on the part of any servant or agent of defendant on the occasion in question, it was attributable to the conductor, Woodruff.

With reference to his failure to stop the train at Coldwell we quote some excerpts from conductor Woodruff's testimony, as follows:

"Q. Now, I will ask you to state to the Jury whether or not your train stopped on this occasion at this crossing—Coldwell? A. It did not.

"Q. Now, tell the Jury in your own way just why you didn't stop there, if you didn't, until the teacher called your attention to the little boy wanting to get off? A. In taking up the fares, I took up the two fares to Wartrace, and this five (5c) cents fare, and I just got it in my head this boy was going to Wartrace. I just got it in my head somehow he was going to Wartrace.

"Q. Then you went ahead to work about getting up your reports? A. Yes, sir.

"Q. Did or not this teacher come to you and say something to you about stopping the train? A. Miss Allen come up to the door and says, 'You are going to take my boy by his station.' I jumped up and pulled the Conductor's valve and the train stopped.

"Q. If I understand you correctly, as soon as the teacher called your attention to the fact that the boy wanted to get off there, you stopped the train? A. Right immediately, yes, sir.

"Q. You pulled the Conductor's valve and when you pull it like you did on that occasion, that does stop the train? A. It stops at once, yes, sir. . . .

"Q. And you don't remember ever carrying this little boy here past his station before? A. No, sir.

"Q. He always got off at Coldwell? A. Yes, sir.

"Q. Then what got it in your mind he was going to Wartrace on

this occasion? A. I just took him and I took this man and girl together, and took this boy's fare, and they were all there together, and it just went in my mind that the boy was going to Wartrace.

"Q. And you testified before he had always told you Coldwell? A. He never did tell me. His teacher told me when I first come on.

"Q. What month was that? A. I don't remember when she first begin.

"Q. And you say the little boy, to your knowledge, never told you what station he wanted off? A. No, sir.

"Q. This little boy had ridden on the train with his daddy? A. His daddy got on two or three times.

"Q. Do you know where they live? A. I knew they lived over there somewhere. I didn't know just where.

"Q. You knew that day where he lived? A. Yes, sir. . . .

"Q. Isn't it a fact after every time this little boy had ridden on that train prior to February 12th, that you got on the back end and you were very nice to him, and you got down on the ground and helped him down, and also helped him on? A. I done that all the time.

"Q. Isn't it a fact, the reason you didn't do it this time was the fact that you forgot? A. I helped him to get on, and would have helped him off, if I hadn't got it in my head he was going to Wartrace.

"Q. He never did tell you he was going to Wartrace, did he? A. No, sir.

"Q. You didn't ask him where he was going? A. No, I just got it in my head he was going to Wartrace. I don't know how come me to do it, but I did. . . .

"Q. And when you got the little boy's nickel you forgot about him? A. No. I got it in my head he was going to Wartrace.

"Q. And you state you were making out your records for the railroad at the time of this accident? A. Yes.

"Q. Is that what got your mind off the child? A. I didn't go to making it out until I collected the people's fare. It was taken up and everything, and I went to making out my report."

With reference to what occurred at the time plaintiff paid his fare, conductor Woodruff testified as follows:

"Q. The teacher and her father were sitting together, and the little boy was sitting in the seat facing them—right next to them? A. Yes, sir, right in front of the teacher and her father, is my best recollection.

"Q. Now, Mr. Woodruff, did you collect the fare from them at any time? A. Yes, sir.

"Q. Do you recall how much the little boy paid? A. He paid five (5¢) cents.

"Q. Do you recall how much Mr. Allen and the teacher paid you? A. Eight (8¢) cents each.

"Q. Was that what you called half fare? Was that the little boy paid you what you called half fare? A. Yes, sir.

"Q. Was the fare that the teacher and her father paid you—was that what you got for the fare from Gray's Crossing to Wartrace? A. Yes, sir, full fare.

"Q. Was that what you call full fare? A. Full fare, yes, sir.

"Q. Where would the five (5¢) cents fare from Gray's Station, or Gray's Crossing—would that apply to Wartrace just as it would to Coldwell? A. Yes, sir, same fare to Wartrace.

"Q. In other words, if I should get on the train at Gray's Crossing, it would cost me just as much to go to Coldwell as it would to go to Wartrace. Is that correct? A. No, sir; not whole fare.

"Q. Not whole fare, but half fare? A. Yes, sir.

"Q. That would be true? A. Yes, sir.

"Q. And when this little boy paid five (5¢) cents, that had his fare paid to Coldwell, or it had it paid to Wartrace, if he wanted to go there? A. Yes, sir.

"Q. Did his teacher live at Wartrace? A. Yes, sir, she lived at Wartrace.

"Q. Did you really know whether the boy was going to Coldwell, or whether he was going to Wartrace? A. This time, he didn't tell me where he wanted to go.

"Q. There was nothing said about it? A. Nothing.

"Q. Did he tell you on this occasion he wanted to get off at Coldwell? A. No, sir."

It is seen that the conductor stated that plaintiff did not tell him "where he wanted to get off," or that " he wanted to get off at Coldwell." On this point, we quote from the testimony of plaintiff as follows:

"Q. F. J., when you got on the train at Gray's Crossing, did you give the Conductor a nickel as you went on, or did he come by the seats and get the money? A. He come by the seats.

"Q. Did you give him your nickel on the day you were hurt? A. Yes, sir.

"Q. When you gave the Conductor the nickel, did you tell him where you were going, or say anything to him? A. Yes, sir.

"Q. What did you say? A. Coldwell.

"Q. Had you been instructed to tell the Conductor that when you got on the train? A. Yes, Ma'am.

"Q. Who had told you to do that? A. Miss Allen."

On this appeal, all conflicts of testimony must be resolved in favor of the plaintiff, and it will be assumed that plaintiff said "Coldwell" when he handed his fare to the conductor; but this seeming conflict may be reconciled upon the assumption that the

conductor did not hear the plaintiff say "Coldwell;" for Miss Allen and Mr. Allen, both of whom (according to the undisputed testimony as to the relative positions of the parties at the time) must have been nearer to the plaintiff than the conductor, testified that they did not hear the plaintiff say "Coldwell" at the time in question.

However, if it be assumed that the conductor did not hear plaintiff say "Coldwell" at the time he paid his fare, we are nevertheless of the opinion that the facts and circumstances in evidence (to which we have, in substance, referred) were sufficient, if the conductor was exercising that degree of attention and vigilance which his duty to plaintiff demanded, to charge the conductor with notice that plaintiff wanted to get off the train at Coldwell; hence the failure of the train to stop "at the station to which plaintiff had obtained passage" is attributable to the oversight or forgetfulness of defendant's conductor, Woodruff.

It is averred by the plaintiffs that the injuries suffered by them were the direct and proximate result of negligence and carelessness of the defendant, described in the declaration of F. J. Harrell, Jr., as follows:

"The platform of the defendant's car in which plaintiff was riding as a passenger on defendant's train was not inclosed, and the conductor, brakeman, and other employees of defendant on its said railway train, negligently failed to call the station as said railway train approached, or to stop said railway train at the station to which plaintiff had obtained passage, but continued the running of said railway train at the rate of speed of approximately thirty-five miles per hour, past said station of Coldwell, in a Northern direction toward the town of Wartrace.

"Plaintiff being a child of only eight years of age, became frightened when defendant's said railway train failed to stop at his station, and as said railway train was traveling at a speed of approximately thirty-five miles per hour, carrying plaintiff away from the station to which he had paid his fare, and away from the home of his parents, plaintiff jumped from the open platform of defendant's said railway car, to the right-of-way of defendant, in which there were many cross-ties, steel rails, rocks of large size, and ditches."

It was held in Louisville & N. R. Co. v. Collier, 104 Tenn., 189, 191, 54 S. W., 980, that a failure to "call the station" cannot be made the basis for a recovery in a civil action to recover damages for personal injuries; that the remedy provided by the statute (a qui tam action) is exclusive.

Moreover, plaintiff and his teacher, Miss Allen, knew that the train was nearing Coldwell, and, therefore, to have called the station would not have served any useful purpose whatever so far as plaintiff was concerned; hence no liability can be predicated upon the failure of defendant's servants to "call the station."

362

■ The remaining averment of negligence in the declaration is that the defendant failed to stop the train at the station to which plaintiff had obtained passage. Plaintiff must recover, if at all, upon the negligent acts or omissions averred in his declaration. East Tennessee Coal Co. v. Daniel, 100 Tenn., 65, 42 S. W., 1062.

■ It is a well-settled rule that when the train fails to stop at the station of destination of a passenger, and he is not directed or induced at the time by act or word of the railroad company's agents to get off, and he does get off while the train is moving at a rapid rate of speed, he does so at his own risk. East Tennessee, V. & G. R. Co. v. Massengill, 15 Lea, 328, 335; Townsend v. Nashville, C. & St. L. R. Co., 106 Tenn., 162, 165, 61 S. W., 56; 10 C. J., pages 926, 927, section 1350.

But the injured passengers in the Tennessee cases above cited were adults; and it is sought to distinguish the case in hand from the Tennessee cases above cited, on the ground that the present plaintiff is an infant of immature years.

As we see the instant case, the question for decision (under defendant's first and second assignments of error) is whether or not the failure of the conductor to have the train stopped at Coldwell was the proximate cause of the plaintiff's injuries?

■ It is an elementary principle of the law governing negligence cases that "an injury is not actionable if it could not have been foreseen or reasonably anticipated." 20 R. C. L., p. 13, section 9; Tennessee Cent. Ry. Co. v. Schutt, 2 Tenn. App., 514, 520.

In Fischer Lime & Cement Co. v. Sorce, 4 Tenn. App., 159, 163, it was held (upon the authority of numerous cases there cited) that: "Assuming the negligence of defendant there could be no recovery if the injury was one which could not have been foreseen nor reasonably anticipated as the probable result of defendant's negligence."

"The test (of the proximate cause of the injury) is to be found in the probable injurious consequences which were to be anticipated, not in the number of subsequent events and agencies which might arise." 22 R. C. L., pp. 134, 135, section 19.

In Jackson v. Nashville, C. & St. L. Ry., 13 Lea, 491, 494, 49 Am. Rep., 663, the court (speaking through Judge Cooper) said: "A long series of judicial decisions has defined proximate, or immediate and direct damages, to be the ordinary and natural results of the negligence, such as are usual and might therefore have been expected; and this includes in the category of remote damages such as are the result of an accidental or unusual combination of circumstances which would not be reasonably anticipated, and over which the negligent party has no control: 2 Thomp. Neg., 1083, citing the authorities. A proximate cause is therefore a probable cause, and a remote cause an improbable cause. A wrong-doer, in other words, is answerable

for all the ordinary and natural consequences of his wrong but no further.''

''And this is true whether the plaintiff's act amounts to contributory negligence or not.'' 22 R. C. L., p. 142, section.26, citing Chattanooga Light & Power Co. v. Hodges, 109 Tenn., 331, 70 S. W., 616, 618, 60 L. R. A., 459, 97 Am. St. Rep., 844, in which case the court, in the midst of the opinion, said: ''Where the result is such that no reasonable man would expect it to occur, and no knowledge is shown in the person doing the negligent or wrongful act that such a state of things exists as to make the damage probable, we think the rule is that the injury will not be regarded as actionable as against the wrongdoer. Sharp v. Powell, L. R., 7 C. P., 253. And especially should this be true where the injury results from an act committed by the injured party so obviously fraught with peril as should be sufficient to deter one of reasonable intelligence. In such a case it would seem impossible to find any ground upon which to maintain that the person guilty of the first act of negligence should be held liable to the party so injured, and the law, upon uncontroverted evidence showing such facts, without more, should relieve the original wrongdoer from liability. In such a case the intervening act of the party injured should be treated as the proximate cause of the injury.''

And the intervening act of a child may be the responsible cause of his own injuries, although the child could not be held guilty of contributory negligence. 22 R. C. L., pp. 140, 141, section 25; Note, 23 L. R. A. (N. S.), p. 251.

It was also held in Chattanooga, etc., Co. v. Hodges, supra, that, although ordinarily a question for the jury, ''where the facts are fairly incontrovertible the question of proximate or intervening cause is for the court;'' and it was so held in the later case of Moody v. Gulf Refining Co., 142 Tenn., 280, 290, 293, 294, 218 S. W., 817, 8 A. L. R., 1243.

In Stephenson v. Corder, 71 Kan., 475, 80 P. 938, 940, 69 L. R. A., 246, 249, 114 Am. St. Rep., 500, there is a forcible statement of rules which we think applicable and controlling in the instant case, as follows: ''When the facts are undisputed, and only one inference or deduction is to be drawn from them, a question of law is presented for the court. Dewald v. Kansas City, Ft. S. & G. R. Co., 44 Kan., 586, 24 P. 1101. However, it is not every act of negligence that furnishes a basis for recovery of damages sustained. In the case of Cleghorn v. Thompson, 62 Kan., 727, 64 P. 605, 54 L. R. A., 402, this court held: 'Negligence, to be actionable, must result in damages to some one, which result in the absence of wantonness or malus animus, might have been reasonably foreseen by a man of ordinary intelligence and prudence, and be the probable result of the initial act. The allegation of negligence is not sustained by evi-

dence of acts resulting in damage to another, which result is not the reasonable and ordinary outcome of such acts, and which would not have been foreseen or anticipated by the exercise of ordinary prudence and foresight under all the circumstances of the case. . . . Negligence is not the proximate cause of an accident, unless, under the circumstances, the accident was a probable as well as natural consequence thereof—one which might reasonably have been foreseen by a man of ordinary intelligence and prudence.' . . . In cases of this character, where two distinct, successive causes, unrelated in operation, to some extent contribute to an injury, it is settled that, where there is an intervening and direct cause, a prior and remote cause cannot be made the basis of recovery of damages, if such prior cause did no more than furnish the condition, or give rise to the occasion, by which the injury was made possible. It seems to be sound in principle, as well as settled by authority, that where it is admitted or found that two distinct, successive causes, unrelated in their operation, conjoin to produce a given injury, one of them must be the proximate, and the other the remote, cause of the injury, and the court, in passing on the facts as found or admitted to exist, must regard the proximate as the efficient and the consequent cause, and disregard the remote cause.''

The principles stated in the authorities herein cited (with respect to the proximate cause of an injury) were applied by this court in the case of Eckerd's Inc., v. McGhee, 19 Tenn. App., 277, 86 S. W. (2d) 570, wherein it was held that the defendant (a druggist) was guilty of negligence in selling, contrary to statute, poisonous drugs, viz., bichloride of mercury tablets and tincture of iodine, to a minor under sixteen years of age, without the written order of some responsible adult person; but that the defendant druggist was not liable in damages to the minor plaintiff, for the reason that her act in voluntarily swallowing the poisons, knowing what she was doing and the probable consequences thereof, and not the negligence of the druggist, was the proximate cause of her injuries; and the judgment of the circuit court for plaintiff was reversed and the suit dismissed.

The undisputed evidence in the instant case seems to us to compel the conclusion that there was nothing in the conduct, character, or condition of F. J. Harrell, Jr., at any time prior to the moment that he jumped from the train, to suggest that he would commit so rash an act. ''The chance that such a thing would happen was so remote as not to come within the scope of reasonable apprehension.'' Fischer Lime & Cement Co. v. Sorce, 4 Tenn. App., 159, at page 164.

The testimony, not only of Woodruff, the conductor, but of the plaintiff himself and of his teacher, his parents, and in fact all of the witnesses in the case, whether introduced by the plaintiffs or the defendant, tends to this conclusion. The proof with respect to the

intelligence, capacity, and experience of the plaintiff leaves no doubt that he was conscious that it was dangerous to jump off the train while it was moving rapidly. See Southern Railway Co. v. Whaley, 170 Tenn., 668, 676, 677, 98 S. W. (2d), 1061.

We do not regard the case of Marion County v. Cantrell, 166 Tenn., 358, 61 S. W. (2d), 477, 478 (upon which counsel for plaintiffs seems to rely with much confidence), as opposed to the conclusions we have reached in the instant case. In the Cantrell Case, the plaintiff's child fell or jumped through an "emergency door" in the rear of a school bus, which door had been negligently left open by the driver of the bus. On the facts of that case, the Supreme Court held: "That one so operating such vehicle might reasonably have foreseen that some child would fall or jump out this door and get hurt; that such an accident was a natural, probable, and proximate consequence of such negligence."

We are of the opinion that defendant's motion for a directed verdict should have been sustained by the trial court, and that there is no evidence to support the verdict. Defendant's first and second assignments are therefore sustained.

In view of our ruling on the first and second assignments of error, supra, the remaining assignments of error become immaterial, so far as the judgment of this court is concerned.

However, it may be proper for us, as an intermediate appellate court, to rule, at this time, upon certain assignments of error through which it is asserted that the trial court erred in charging the jury, in substance, that it was within the discretion of the jury to allow plaintiffs a recovery of exemplary or punitive damages; and in refusing a request of defendant, seasonably presented, to charge the jury that there could be no recovery of exemplary or punitive damages in these cases.

These assignments of error are sustained. In order to justify the allowance of exemplary damages "there must have been some willful misconduct, or that entire want of care which would raise the presumption of a conscious indifference to consequences." East Tennessee, V. & G. Ry. Co. v. Lee, 90 Tenn., 570, 574, 18 S. W., 268, 269; Louisville, N. & G. S. R. Co. v. Guinan, 11 Lea, 98, 102, 47 Am. Rep., 279. A statement of the court in the case of Louisville & N. R. Co. v. Stacker, 86 Tenn., 343, 351, 6 S. W., 737, 740, 6 Am. St. Rep., 840, is applicable to the instant case. It was there said that: "There was no evidence of any wanton or grossly negligent conduct on the part of the company. At most, it was an act of carelessness, without intended, anticipated, or probable injury to any one, and the verdict, if sustained at all, must be upon the theory that it was only a fair compensation upon the terms of the statutes."

It results from our ruling upon the defendant's first and second assignments of error, that the two judgments brought up for review

in the instant case are reversed, the verdicts are set aside, and the plaintiffs' suits are dismissed.

The costs of the cause, including the costs of the appeal, will be adjudged against the plaintiff F. J. Harrell.

Crownover and Felts, JJ., concur.