GEORGE W. GUESS and CHARLES EDWARD
PASEUR, Plaintiffs in Error, v. LIGHT, GAS &
WATER DIVISION OF THE CITY OF MEMPHIS,
Defendants in Error.—403 S.W.(2d) 115.

Western Section. June 25, 1965.

Certiorari Denied by Supreme Court February 7, 1966.

Wyeth Chandler, Chandler, Manire, Johnson & Chandler, Robert L. Dobbs, Memphis, for plaintiffs in error.

Charles C. Crabtree, William A. Sands, Leo Bearman, Memphis, for defendant in error.

CARNEY, J. The plaintiffs below, George W. Guess, aged 43, and his co-worker, Charles Edward Paseur,

aged 35, were severely injured and burned on February 12, 1962, when an aluminum ladder which they had lifted preparatory to getting on top of a newly constructed gymnasium at Watkins Overton High School in Memphis, Tennessee, allegedly came in contact with an uninsulated high voltage transmission line maintained by the defendant. Both Mr. Guess and Mr. Paseur brought suit for damages against the defendant, Memphis Light, Gas & Water Division. The cases were tried together. The principal defense was that the high tension lines were placed higher above the ground and farther away from the newly constructed gymnasium than required by the National Electrical Safety Code and that the defendant was not and could not be guilty of negligence insofar as the plaintiffs' claims for damages were concerned. His Honor the Trial Judge agreed and sustained a motion for directed verdict in each case at the conclusion of all the proof.

Both plaintiffs appealed in error to this court. The causes were set for argument on March 11, 1965. The attorney for plaintiff George Guess appeared and made oral argument. Attorney for plaintiff Paseur filed assignments of error and brief but did not appear for the oral argument. He intended to adopt the oral argument made by attorney for the plaintiff George Guess. Such announcement, if made, escaped the attention of the court.

The assignments of error and brief in behalf of plaintiff Paseur became separated from the transcript of the record and briefs and arguments in behalf of plaintiff George Guess. The Guess case was assigned to this member of the court for the preparation of the opinion. We erroneously assumed that there was only one case before

the court for consideration, namely the case of the plaintiff, George Guess, vs. the Light, Gas & Water Division. An opinion was prepared by this member of the court and announced of date May 11, 1965, reversing the action of the Trial Judge and remanding the case of George Guess against the Memphis Light, Gas & Water Division for a new trial. The opinion also erroneously stated that the case of Paseur vs. Memphis Light, Gas & Water Division was not before the court for consideration at that time.

When our error regarding the case of plaintiff Paseur became known attorneys for defendant requested further argument upon the assignments of error of plaintiff Paseur. This request was granted. By consent entry of decree in conformity with the opinion of this court in the case of George Guess vs. Memphis Light, Gas & Water Division announced of date May 11, 1965, was withheld pending argument of the case of Paseur vs. Light, Gas & Water Division. Argument in the case of Paseur vs. Memphis Light, Gas & Water Division by attorneys for plaintiff Paseur and defendant Light, Gas & Water Division was held before this court on Tuesday, May 25, 1965. We now have the case for disposition.

Prior to April 11, 1961, defendant's high voltage lines were directly across the area upon which the gymnasium for the Watkins Overton High School was to be built. At the request of the Board of Education of the City of Memphis the lines were moved. Three lines carrying approximately 12,500 volts of electricity between phases were installed on an 8-foot cross arm along the north side of Mallory Avenue and parallel with the south wall of the gymnasium. The power line closest to the south wall of the gymnasium was 29½ feet away and about

27 feet above the ground. Mr. Mayer, Overhead Design Engineer for defendant, stated that the voltage from wire to ground would be 7200 volts.

East of the east wall of the gymnasium the Light, Gas & Water Division ran three additional high voltage lines carrying approximately 12,500 volts north and south and almost parallel with the east wall of the gymnasium. The westernmost of the three wires running north and south was 23½ feet from the southeast corner of the gymnasium and 26 feet from the northeast corner of the gymnasium. The aluminum ladder being lifted by plaintiffs came in contact with or too close to the westernmost wire at a point near the southeast corner of the gymnasium. The top of the east wall of the gymnasium was 25 to 30 feet high. The high tension wire at the point of contact with the ladder was 25½ feet above the ground. Three feet under the high tension wires were an electric wire carrying a fire alarm circuit and also a telephone cable. These wires were insulated and were not the property or under the control of the Light, Gas & Water Division. They are not involved in this lawsuit.

The National Electrical Safety Code is published by the National Bureau of Standards, Department of Commerce of the United States. It prescribes minimum safety standards for construction of electrical power lines and installations and is used generally by utility companies throughout the United States. The power line by which plaintiff was almost killed in the present case was placed 23½ feet away from the building under construction whereas the National Electrical Safety Code prescribes a minimum of 8 feet separation between high voltage lines and a "building." The National Electrical Safety Code provides a minimum clearance of 15 feet

above the ground for high voltage wires whereas the voltage wires in the present case were a minimum of 25½ feet above the ground. The National Electrical Safety Code does not differentiate between a building under construction and a building being torn down or a building that has already been constructed. The Code provides only for a minimum clearance of 8 feet between the "building" and the high voltage line.

The plaintiff, George W. Guess, had been employed as a painter practically all of his adult life except for time spent in the army. In April, 1959, he sustained an injury to his left leg or ankle when he fell about 40 feet from a chair while painting the steeple of Calvary Episcopal Church in Memphis. Apparently a rope broke causing him to fall.

At the time of his injuries in the present case at Watkins Overton High School Gymnasium plaintiff Guess was employed by his brother who had the painting subcontract on the gymnasium job. On the day of the accident the superintendent of construction told plaintiff Guess and co-worker Paseur, also a painter, to prime in a metal strip which ran around the top of the gymnasium wall. Plaintiff and his co-worker, Paseur, had been using rolling steel scaffolds and painting inside 25 to 30 feet off the floor.

To prime the metal strip it was necessay for the plaintiff and his co-worker, Paseur, to get up on the top or very near the top of the gymnasium wall. There were no wooden ladders long enough to get them on the roof. The plaintiffs found an extension ladder made of aluminum. The wall was 25 to 30 feet high. The plaintiff and his co-worker, Paseur, extended the aluminum ladder to a length of 37 feet on the ground. At this time they were

standing several feet east of the southeast corner of the gymnasium. They explained that the ladder had to be extended on the ground and then placed on the wall of the gymnasium rather than placing the ladder against the wall and then extending it up against the wall because the superintendent of construction would object to defacing the newly constructed wall by the marks of the ladder being extended up the wall.

A study of plaintiff Guess' testimony indicates that he sustained some brain or nerve damage as a result of the electrical shock. His recollection of the events leading up to the contact with the high tension wire does not appear to be entirely trustworthy. His co-worker, plaintiff Paseur, gives a little clearer account.

Plaintiff Guess testified that he did not know that the wires were uninsulated; that it was his intention, after extending the ladder out to 37 feet, to carry it northward the entire length of the east wall of the gymnasium or a total distance of 125 feet and to place the ladder against the wall at the northeast corner in order to get on top of the building. He stated that after the ladder was extended on the ground he put both of his feet at the end of the ladder and reached out and tried to pull up as much as possible while his co-worker pushed the ladder upward until they got it standing straight up; that he, plaintiff Guess, tilted the ladder backward which is the regular way to carry a ladder forward; that he then remembered his co-worker, plaintiff Paseur, running toward him and he remembered nothing else until he was in the hospital; that there was sand and mud under their feet.

His co-worker, plaintiff Paseur, testified that he had worked on the building only one day, having come from another job and did not know there were any uninsulated

high tension wires above the building. He testified that he knew of no intention on the part of plaintiff Guess to carry the ladder from the southeast corner of the gymnasium to the northeast corner of the gymnasium. He, Paseur, contemplated that the plaintiff, Guess, would place the ladder as extended at the top of the wall near the place where they had extended it. Mr. Paseur testified that his work crew had a 24-foot wooden ladder which was too short to get them on the building; that he located an aluminum extension ladder owned by some other crew working on the building and either he or plaintiff Guess got permission to use the ladder and they extended it to a length of 37 feet on the ground.

As to his recollection of the contact of the ladder with the electrical wire we quote as follows:

"Q All right, sir. Would it have been raised by elevating the north end of the ladder or the south end of the ladder, if you remember?

A Wait just a minute. You all have got this backward to me. By using the end of that table you are on the front side of that building?

Q I said assuming this to be the east end of the building that you were working on (indicating) and this to be the south end of the building, south side of the building (indicating). This woud be south (indicating), and this would be north (indicating).

Now, with that assumption you have said that the ladder was lying in this general direction (indicating)?

A Yes, sir.

Q Is that correct?

A Yes, sir.

Q All right, sir. That being true, when you say that you lifted the ladder, and Guess braced it, did Guess brace it from this end, the north end (indicating), or did he brace it from the south end?

A I don't remember that particular point.

Q You don't remember that at all?

A Not that particular detail, I don't.

Q But you do know that you braced—I mean pushed the ladder up, and Guess braced it?

A Did I say I pushed it up?

Q Yes.

A I thought—I meant to say I braced the ladder and Guess pushed it up is what I meant to say.

Q Guess pushed it up, and you braced it?

A Yes, sir.

Q All right, sir. If those are the circumstances, what happened when the ladder got in an upright position?

A When the ladder was in an upright position I was holding it, and Guess said, 'I will take the ladder to the building.'

Q He would take the ladder to the building?

A He walked around and took a'hold of the ladder and I asked him if he had it all right by himself, and he said yes.

Q And then what happened?

A He started toward the building with it.

Q How close to him were you when he started toward the building?

A I would not think I was over two or three feet from him, just stepped back.

Q All right, sir. Then when he started toward the building were you looking at him?

A Yes, sir.

Q And what, if anything, happened at this point?

A I saw the ladder was getting overbalanced. We was in some wet sand, the best I can remember, and George must have stepped in a hole or something, and the ladder was getting overbalanced, and I reached for it.

Q You reached for it?

A Yes, sir.

Q And when you reached for it what happened?

A I don't know.

Q Is that the point when the electrical charge came down the ladder and went through your body?

A It must have been.

Q That is what you understand from past experience of the situation?

A Yes, sir.

Q Do you remember anything after that, Mr. Paseur?

A No, sir, except coming to once or twice on the job, before—you know, when the firemen were working on us I came to once or twice, and they was asking me my name and where I lived, and I remember I couldn't even tell them where I lived or anything like that.

Q Was this a severe jolt to you?

A No, sir, I didn't feel anything.''

At the close of all the proof His Honor the Trial Judge was of opinion that the defendant was guilty of no negligence and that the plaintiffs were the authors of their own injuries. We copy his remarks as follows:

"THE COURT: Considering the plaintiffs' proof in its most favorable light, including any and all inferences that may be drawn therefrom, which is the test the Court must use in passing on motions for directed verdicts, the Court is of the opinion that the motions are well taken and therefore should be sustained, the motions on behalf of the defendant in each of these cases for a directed verdict.

There is, in the opinion of this Court, no proof showing or tending to show negligence on the part of the Memphis Power and Light Company. On the contrary, the proof shows that the defendant erected and maintained this power line in accordance with the safety rules promulgated by the National Safety Code.

The proof shows that the line was some twenty-seven and a half feet at the center line of the building, twenty-five and a half feet high, which is more than the Safety Code provides.

I don't know of any theory on which this Court could submit this case to the jury, any issue of negligence on the part of the Power and Light Company.

Of course, all power lines are dangerous, potential danger in all power lines, but they are necessary. The people working around power lines and in close proximity are charged with the knowledge of the danger of power lines. I don't think it could be said, and certainly the Court can't submit to the Jury the issue of whether or not this defendant was liable or negligent

for not having a supervisor out there. There are hundreds and hundreds of jobs going on all the time all over town, and that would require the Memphis Power and Light Company to keep and maintain supervisors out there, people on all these jobs to warn people who are working on the jobs, and to my mind that is a little far afield.

I don't know what else they could have done. It is not negligence, according to the proof and the authorities, to maintain uninsulated lines throughout municipalities. They are all over town, so I don't know of any theory on which this Court could submit to the Jury any issue of negligence on the part of the Power and Light Company.

You may say, 'Well, they should have foreseen the happening of this event.' To say that the power company should have foreseen that two painters, employees who have been engaged in this kind of work for years and years and years, would place an extension ladder or metal ladder in an upright position and try to move it from the southeast corner to the northeast corner, in an upright position, and that they would lose control of it and it would fall over and come in contact with the power line, of course, would be unreasonable.

If the power company could have known that was going to happen they would have rushed someone out there, but that was not their responsibility in the discharge of the highest degree of practical care, so that I am of the opinion that the proof wholly fails to show any act of negligence on the part of the Memphis Power and Light Company, and I am also of the further opinion that these two plaintiffs were the author of their own injuries growing out of this accident. It

is most unfortunate that these two men had this accident, but they are really the authors of their own injuries.

It was through their manipulations of that ladder, the manner and method in which they intended to place that ladder up there that they lost control of it. That is their own carelessness.

When you extend an extension ladder thirty-seven and a half feet in the air and try to carry it in an upright position from one end of a building to another, that, in my opinion—the Jury might disagree with me on that—but that, in my opinion, was carelessness on their part.

As I say, there is no doubt in my mind that these two painters were the authors of their own injuries. Both of them denied they knew anything about the existence of high tension lines out there, but they are charged with the knowledge of the presence of those lines on the ground that they should have known what a reasonably prudent person could have known and could have seen by looking up there, they could see these wires.

So that the Court is of the opinion, first, there was no negligence on the part of the power and light company, and secondly, that these two plaintiffs were guilty of carelessness, and they are the author of their own injuries, and therefore, that, in my opinion, is the direct and proximate cause of this accident and the resulting injuries to these two plaintiffs.

The Court will sustain the motions on behalf of the defendant in each of these two cases.''

It is the insistence of the defendant, Light, Gas & Water Division, that the action of the Trial Judge in directing verdicts must be upheld upon the authority of the cases of City of Chattanooga v. Shackleford, 41 Tenn. App. 734, 298 S.W.(2d) 743, and Johnson v. Johnson City, 41 Tenn.App. 148, 292 S.W.(2d) 794. In Johnson v. Johnson City the plaintiff, Johnson, was an employee of an appliance dealer and had been engaged for five months preceding the accident in selling and installing television sets in Johnson City, Tennessee.

On the day of the accident he was preparing to install a television antenna at a residence. The city's primary power line carrying 7200 volts to the ground was strung on poles along the street with the poles being planted in a glassy plot between the sidewalk and the street. The primary line was about 27 feet above the ground. Between the front of the residence and the poles located next to the curb there was a yard 10.3 feet in depth and the sidewalk was 4½ feet in width. To determine the proper height for the television antenna to be installed plaintiff Johnson used a trailer cart on which was located a telescopic rod or boom pole 22 feet in length but which could be extended to 55 feet in the air by means of a crank.

Plaintiff's helper cranked the telescopic boom up into the air and the boom pole either was cranked into the primary wire or it swayed and touched the primary wire as a result of which the young boy turning the crank on the trailer cart was instantly killed and the plaintiff was severely burned. The power line was plainly visible, the plaintiff knew it was there; the power line was 7 feet above the minimum prescribed by the National Electrical Safety Code and Judge Winfield Hale stated that the

power line was not located in close proximity to where men would be supposed to work. The trailer cart was not grounded.

This Court, Eastern Section, held that the defendant City was not guilty of negligence in running its uninsulated primary wires along the city street and was not required to anticipate that someone would negligently run an antenna telescope up into such primary wire in the course of installing a television antenna. This court also held that the plaintiff's negligence in failing to ground his trailer cart and in running his telescope up into the primary line was the proximate and sole cause of the plaintiff's injuries. In our opinion the case of Johnson v. Johnson City differs from the present case at bar in two respects; (1) In the present case the defendant, Light, Gas & Water Division, restrung the high voltage wires for the express purpose of permitting the construction of the gymnasium at the Watkins Overton High School. (2) The plaintiffs did not know that the wires were uninsulated and they had not been warned of danger from the wires.

In City of Chattanooga v. Shackleford, supra, plaintiff's husband, William B. Shackleford, a roofer 42 years of age, was killed when a piece of guttering he was handling came in contact with an uninsulated 2400 volt electric wire maintained by the defendant, City of Chattanooga. Plaintiff's decedent was an intelligent man with 17 years experience in installing new guttering on buildings. He was fully cognizant of the location of the high voltage wires and on the day of the accident was halfway up a ladder with a length of new guttering on his right shoulder and he spoke to his helper, one Thomasson, who was on the roof removing the old guttering, ''Watch them

wires" to which Thomasson replied, "You better be the one to watch them, cowboy." Despite his knowledge of the danger from the wires and despite the warning from his helper the decedent began shoving the guttering back over his shoulder without looking and the guttering came in contact with the deadly wire which killed him. This court, speaking through Judge Peabody Howard, reversed the judgment of the lower court and sustained a motion for a directed verdict in favor of the defendant holding that the decedent was guilty of proximate negligence and the sole cause of his death.

There is no proof in the case at bar that the attention of the plaintiffs Guess and Paseur was ever called to the existence of the high tension wires prior to the time the ladder became unbalanced and fell against said wires. For this reason we hold that the Shackleford case is not controlling of the case at bar.

In Coatney, Admr. v. Southwest Tennessee Electric Membership Corporation, 1956, 40 Tenn.App. 541, 292 S.W.(2d) 420, opinion by Judge Bejach, this court reversed a directed verdict for the Electric Membership Corporation in a suit involving the death of two men while engaged in removing a portable television antenna which they had previously erected at the home of James Cloud. The portable antenna came in contact with a high voltage wire carrying from 6900 to 7200 volts which was located on the Cloud property. It was insisted by defendant that since the undisputed evidence established that the construction of the high voltage wire upon the Cloud property was in accordance with the National Electrical Safety Code and the Rural Electric Authority specifications that the defendant could not properly be held guilty of any negligence. This court held that it was

a question of fact for the jury to determine whether or not the defendant Corporation was guilty of negligence in running an uninsulated high power line across the Cloud property with no warning signs or other notice to Mr. Cloud or the public of the existence of such uninsulated high power line.

In the case of Kingsport Utilities v. Brown, 1955, 201 Tenn. 393, 299 S.W.(2d) 656, 69 A.L.R.(2d) 87, opinion by Justice Swepston, our Tennessee Supreme Court upheld judgment in behalf of two workmen for injuries from electrical shock and burns sustained when the cable of a crane came in contact with a 12,000 volt line. The five plaintiff workmen were injured and the foreman in charge of a construction project was killed. The primary wire conductors carrying 12,000 volts were placed on poles 29 feet high and the wires at the point of contact were 25 feet above an alley. The operator of the crane moving heavy machinery on a construction project under the power lines knew of the existence of the power lines but some way let the boom of the crane come in contact with the lines. The employer of the operator of the crane was held liable for the negligence of the operator of the crane. Judgment was also rendered against the Utilities even though the installation of the primary electrical wires conformed to the minimum standards of the National Electrical Safety Code. From the opinion of Justice Swepston we quote as follows:

"It does seem, therefore, that it is at least a question of fact about which the minds of reasonable men might differ as to whether a utility is negligent in having such high-powered voltage in lines uninsulated, running through the business section of towns. Of course the law does not require that all lines be insulated at

any particular place but only where persons are likely to be and have a right to be, for business, pleasure or otherwise. Judge Felts has covered the question of foreseeability in his opinion in Spivey v. St. Thomas Hospital, 31 Tenn.App. 12, 211 S.W.(2d) 450.

This line, as stated above, was constructed in 1949, before this area was taken in the city and, while it may be true that there is no evidence to the contrary that it was constructed in accordance with the minimum standard of the Electrical Code and the high standard of the art at the time, the evidence is that this has been a growing section so that what was safe at the time of construction, would not necessarily be safe under changed conditions.

The cities of Knoxville, Nashville and Memphis have filed briefs amicus curiae, complaining among other things, of the increased cost of more adequate insulation. When the likelihood of danger to human life is to be balanced against the cost of insulation, we do not think the latter is a very good argument.

We therefore deny the writ.''

In the case of City of Chattanooga v. Rogers, 1956, 201 Tenn. 403, 299 S.W.(2d) 660, opinion by Mr. Chief Justice Burnett, there was a judgment in favor of the administratrix whose husband was electrocuted when the boom of a crane came in contact with an uninsulated power line 27 feet above the ground. Upon the first trial there was a directed verdict for the defendant which was reversed by this court and remanded for a new trial. See Rogers v. City of Chattanooga, 1955, 39 Tenn.App. 176, 281 S.W.(2d) 504. Our Tennessee Supreme Court approved the judgment for the plaintiff on the second trial

and held that the question of proximate negligence on the part of the defendant operator of the electrical power distribution system was properly submitted to the jury. The opinion of Chief Justice Burnett referred to with approval the opinion of this court published after the first trial in 39 Tenn.App. 176, 281 S.W.(2d) 504, supra, and also the opinion of Mr. Justice Swepston in Kingsport Utilities, Inc. v. Brown, 201 Tenn. 393, 299 S.W.(2d) 656, including the portion of Judge Swepston's opinion quoted above.

In the case of International Harvester Company v. Sartain, 32 Tenn.App. 425, 222 S.W.(2d) 854, opinion by Judge Swepston, it was held that the duty of electric companies to exercise due care in the installation and maintenance of high voltage electrical wires extends to every place where persons have a right to be for business, convenience or pleasure.

From our opinion after the first trial in the case of Rogers v. City of Chattanooga, 1955, 39 Tenn.App. 176, 281 S.W.(2d) 504, we quote as follows:

"The jury might well find that these defendants in erecting and maintaining a 11,000-volt electrical line at this particular location, to-wit, an industrial area, should have reasonably foreseen that someone might negligently allow an iron pipe, a boom cable, or other conductor of electricity, to come too close to the high-tension wire and as a result thereby one or more persons be killed or greatly injured. If the jury should find that the defendant should have reasonably foreseen that such might happen and failed to take the necessary steps to prevent the same, then it would be guilty of negligence which was the direct and proximate cause of such injuries.

As was said in Spivey v. St. Thomas Hospital, 31 Tenn.App. 12, 211 S.W.(2d) 450, 456:

' "If there is a substantial likelihood that certain conduct, when pursued by the defendant, will result in some appreciable harm to the plaintiff's person, then the defendant, if he so conducts (sic), cannot escape liability on the ground that he could not foresee the precise manner in which the harm would occur, nor the exact nature of the harm, nor the full extent of such harm. What must be foreseen, in order to establish negligence, is 'harm in the abstract, not harm in the concrete.' " '

It follows that we must hold that it was properly a matter for the jury to determine whether, under all the facts and circumstances, the acts of the defendant in erecting and maintaining the 11,000-volt power line uninsulated at the site of the accident in this case, at a height of 27 feet, constituted negligence, and if such conduct was found to be negligent, whether said negligence was the direct and proximate cause of the death of plaintiff's intestate.

The Assignments of Error are sustained, and the judgment of the Trial Court must be reversed and the case remanded for a new trial. The defendant-in-error will be taxed with the costs of the appeal."

■■ Now, in the case at bar we must remember that the Light, Gas & Water Division was asked by the Board of Education of Memphis, Tennessee, to move its high tension lines in order to make room for the construction of the gymnasium for the Watkins Overton High School. Necessarily then the officials of Light, Gas & Water Division were fully aware that with the construction work

would come many workmen from the different building trades with all kinds of construction paraphernalia such as metal scaffolding, trucks loaded with heavy steel, metal tools, long lengths of guttering, metal cables, ropes, pulleys and even ladders both wooden and metal. It is a matter of common knowledge and courts recognize that electricity, if not properly safeguarded, is one of the most dangerous and lethal agencies known to man. It is invisible; it is noiseless; and it strikes without warning. Our courts have repeatedly held that the operators of electric transmission lines are held to the highest degree of care short of being insurers toward all people who might reasonably be expected to come into contact with such electric transmission wires. Therefore such companies are under an obligation to take all precautions reasonably available to them to prevent such persons coming in contact with such electric transmission lines.

Upon the trial of this case below there was no question made but that the two plaintiffs were injured as a result of electricity being conducted from the high tension wires of the defendant down through the aluminum ladder being held by plaintiff Guess. However, the evidence does not clearly show whether the aluminum ladder actually came in contact with the high tension wire or whether the electricity arced or jumped from the transmission wire over to the aluminum ladder when it came in close proximity thereto. We notice no proof in the record indicating a burning of either the transmission wire or the aluminum ladder. This indicates that the two might not have actually come in contact with each other but that the electricity may have arced from the wire to the ladder. It is admitted that the transmission lines were uninsulated and that the defendant did not give, and did not attempt to give, any warning of any kind

to the workers on the gymnasium project of the danger latent in the transmission lines.

On the contrary the defendant, Light, Gas & Water Division, insists that it fully discharged its degree of care for the protection of the construction workers on the gymnasium project by relocating its heavily charged power lines 23½ feet from the southwest corner of the gymnasium and 25½ feet above the ground and at distances much further from the building itself and from the ground than required by the National Electrical Safety Code and that it owed no duty to attempt to give warning of the danger to the workers on the project, including, of course, the two plaintiffs in the present case. Also the division argues with much cogency that in view of its hundreds of miles of high voltage lines in the business and residential areas of Memphis and Shelby County the expense of insulating all of these lines would be prohibitive. However, it does admit that it is accustomed to insulating the lines in the immediate area where its own workers or employees are working on such transmission lines. Such insulation material comes in the form of six-foot hoses which can be very easily placed over and around the transmission lines and quickly removed when the workmen have finished working in the immediate area.

■ Certainly we do not think it is absolutely necessary for the Light, Gas & Water Division to insulate all of its high voltage lines throughout the business and residential areas of Memphis and Shelby County in order to fulfill its obligation of the highest duty of care to prevent injury or death from the deadly electricity being transmitted over its lines. In some instances it might be that the duty of highest care could be met by merely conform-

ing to the minimum standards prescribed by the National Electrical Safety Code. However, in many instances merely complying with the requirements of the Safety Code could fall short of exercising the highest care for the safety of persons who might reasonably be expected to be working near such deadly electricity.

We think the size and nature of the construction project as well as the location are factors to be considered by the Light, Gas & Water Division in determining the safety precautions to be used in running its high power lines to or near the construction site. In some instances removing the wires a considerable distance from the building to be constructed and a considerable height above the ground might be sufficient protection against injury to construction workers. In other instances the terrain, location of streets, trees, etc. might make it impractical and very expensive to locate the wires a great distance away from the building site in which case insulation of the wires in the construction area and/or posting danger warnings to be seen by the workmen might be necessary to afford reasonable protection against injury to the workers.

The defendants cite the very recent case of Dean v. Fineberg Packing Co., 54 Tenn.App. 159, 338 S.W.(2d) 651, opinion by Judge Bejach, in which we stated, ''When the facts are undisputed, and only one inference or deduction is to be drawn from them, a question of law is presented for the court.'' In the instant case the facts are not undisputed, and we think more than one inference or deduction can be drawn from the testimony.

For instance, attorneys for defendant and His Honor the Trial Judge assumed that the plaintiff, Guess, intended to walk from the southeast corner of the building

with the ladder to the northeast corner of the building and then place the ladder against the building and such witness did, in fact, on cross-examination so testify. However, this testimony is controverted and contradicted by the testimony of his co-plaintiff, Paseur, who testified, "He started toward the building with it." The wife of the plaintiff, Guess, testified that Mr. Guess' memory had been poor since his injury. This was a disputed question of fact for the jury.

■ In considering the action of the Trial Judge in directing verdicts in favor of the defendant, this Court must look at all of the evidence and construe it most favorably to the plaintiffs. It must take the plaintiffs' evidence which supports their theory as true and discard all countervailing evidence and indulge all reasonable inferences in favor of the plaintiffs. Jarratt v. Clinton, 34 Tenn.App. 670, 241 S.W.(2d) 941; Dunn v. Ralston Purina Co., 38 Tenn.App. 229, 272 S.W.(2d) 479.

■ When we apply such rule to the case at bar it is the opinion of a majority of this court that a jury of twelve reasonable and ordinary men might well find that the officials of the Light, Gas & Water Division were negligent in not insulating the wires in the area of the construction of the Watkins Overton High School Gymnasium or in the alternative making a reasonable effort to warn the workmen on this project that the wires were in proximity to the building and highly dangerous. Such warning could have been in the form of printed signs of a shape, color and size to attract the attention of the workmen on the project placed on the wires and/or in or about the gymnasium project. These warning signs could be procured by the Light, Gas & Water Division on a volume basis at a very low cost per unit. If such a

warning had been given by the Light, Gas & Water Division in the present case the plaintiffs, Guess and Paseur, might well have been spared the extreme crippling and permanent injuries which they have sustained. We have no doubt that such a practice of placing warning signals about construction projects would save some lives in days to come.

Defendants further insist that even if it be conceded that the jury could find that the defendant, Light, Gas & Water Division, was negligent in not insulating its transmission lines in and around the construction project and/or in the alternative negligent in not attempting to give any warning of any kind to the plaintiffs and other workmen of the latent danger, that such negligence could not be the proximate cause of the plaintiffs' injuries and at most only a condition; citing and relying upon the cases of Nashville, C. & St. L. R. R. Co. v. Harrell, 21 Tenn.App. 353, 110 S.W.(2d) 1032; Eckerd's, Inc. v. McGehee, 19 Tenn.App. 277, 86 S.W.(2d) 570; and Louisville & N.R. Co. v. Head, 46 Tenn.App. 612, 332 S.W.(2d) 682; Ward v. University of the South, 209 Tenn. 412, 354 S.W.(2d) 246. None of these cases involved injury to plaintiffs by electricity and we think they are not applicable to the case at bar.

In a supplemental brief the defendant has cited and relies upon the case of Jowett v. Pennsylvania Power Company, 1955, 338 Pa. 330, 118 A.(2d) 452. In this case the proof showed that the defendant, Power Company, had warned some homeowners with television antennae of the danger latent in the high tension lines running along the street. The defendant power company failed to warn plaintiff's intestate of the danger. The power lines were strung in 1938 about 39 feet above the street level

and 22 feet from the peak of the roof of the Jowett home. In 1951 Mr. Jowett installed an aerial on the south side of his home. The aerial was supported by two pieces of ordinary galvanized pipe coupled together to a total of 47 feet 6 inches.

A windstorm tore loose one of the guy wires from the television aerial. Mr. Jowett and his father set about to lower the television antenna for the purpose of repairing the guy wire. The iron pipe on which was located the antenna broke at the coupling immediately below the roof line and one of the prongs of the antenna either touched or came so close to the high tension lines that an arc developed bringing the electricity down the iron pipe killing Mr. Lee A. Jowett and seriously injuring his father, Jonathan Jowett.

The proof showed that the two lengths of pipe had been coupled together in an extremely defective manner in that while one of them extended into the coupling 1¼ inch the other had been screwed in only about ¼ inch. While the majority opinion did make the statement that the defendant was not obligated to warn plaintiff's intestate of the latent danger in the high tension wire, the opinion affirmed a compulsory nonsuit given by the lower court on the theory that the failure to warn was not the proximate cause of the accident but the defective coupling. We quote as follows from page 457 of 118 A(2d):

"What is entirely clear is that the actual and proximate cause of the accident was the defective condition of the coupling, which, without proved negligence on the part of either party, broke under handling by the Jowetts and thereby brought about this wholly unanticipated and fortuitous fatal occurrence."

Justice Musmanno dissented and stated that in his opinion the failure to warn Mr. Jowett of the existence of the high tension wires after having knowledge that he had a television antenna in close proximity thereto was a proximate cause of the plaintiff's injuries. The Jowett case is not sufficiently analogous on the facts to the cases at bar to be controlling.

■ His Honor the Trial Judge found that the plaintiffs were authors of their own injuries; that they were negligent in raising the ladder in the manner in which they did and in losing control of it and their negligence was the sole cause of their injuries. It is the opinion of a majority of this court that His Honor the Trial Judge invaded the province of the jury and that it was a question for the jury to determine (1) whether the defendant, Light, Gas & Water Division, was guilty of any negligence, (2) if the jury found such negligence on the part of the defendant whether or not such negligence was a proximate cause of the plaintiffs' injuries, and (3) whether or not the plaintiffs were guilty of negligence which proximately or remotely contributed to their own injuries.

Since the cases were tried below together and there is only one transcript and one bill of exceptions before this court, the former opinion of this court filed of date May 11, 1965, in the case of Guess v. Memphis Light, Gas & Water Division will be recalled and this opinion substituted therefor.

We hold that His Honor the Trial Judge was in error in directing verdicts in favor of the defendant and against each plaintiff and that the assignments of error in each case should be sustained and the judgment of the lower court reversed and the causes remanded for new trials.

The costs of these appeals in error will be taxed against the defendant-in-error, Memphis Light, Gas & Water Division. The costs in the lower court will abide the second trial.

Avery, P.J.(W.S.), dissents.

Bejach, J., concurs.

AVERY, P.J.(W.S.), (dissenting).

Mrs. Guess said:

"Well, before the accident I didn't notice him forgetting things which I have since the accident, like, you know, if he hears a conversation or something, and maybe I mention something in the conversation later, well he says, 'I didn't hear them say that, I don't remember it'."

Plaintiff Guess had been hurt on four occasions prior to the involved accident. He had a right leg hurt in an accident. He fell 40 feet at a church structure and hurt his left leg ankle. He had been adjudged to have a 75% permanent partial disability of the left leg. He was walking in sand, according to the undisputed proof in this case by both plaintiffs, which was somewhat damp and soft, and under such condition he and his friend, Paseur, attempted to raise this 37 foot ladder to its full length as it lay on the ground, and in the manner described, while Paseur held his feet on one end of the ladder Guess raised it from the other end in an unright position, after having it completely extended. While fully extended and held by Guess he made some kind of stepping movement and the ladder began to sway or lean and Paseur says he then reached for the ladder, and that was the last thing he remembered.

Here we have two expert painters of long years of service, extending the ladder 37 feet, raising it to a perpendicular position with the man who was carrying it intending to walk along the wall approximately 100 feet in a corridor which was approximately 25 feet wide between the wall and the power line with which the ladder came in contact. Paseur said they were going to the wall with it, but certainly the man who was carrying it, even though it was intimated that his memory was not as good as it was before, said it was his intention to carry that ladder to the other end of that wall, approximately 100 feet from where it was raised.

To say that a painter who has been engaged in painting buildings for a long number of years, and particularly one who admitted he had fallen 40 feet, which was higher than the wall of the present building he was about to get upon to paint the belt around the top, had not had judgment enough to be careful for his own safety under the situation described in this record, after the City had more than complied with the best authorities known to construction and placement engineers for the safety of workers and others, is it reasonable that they would undertake to perform such activity as they describe? In fact, Paseur does not help the situation any as it relates to him. There being two of them, it doesn't take an expert to realize the fact that the common sense thing to have done would have been for one to have taken one end of that ladder in one hand and the other to have taken the other end in one hand and carried it to the corner on the wall where they expected to put it up. This, the Court could thoroughly understand.

So we have a situation which is not parallel to facts in any reported case in the books that we can find. The

writer dissented in the opinions in the cases of Coatney v. Southwest Tenn. Elec. Corp. and Turner v. Tenn. Valley Elec. Co-Op., 40 Tenn.App. 54, 288 S.W.(2d) 747, and we have during the time we have had these opinions under consideration, read every case in the books, particularly as relates to the decisions in Tennessee. What precaution is a city required to take other than that which it did? If it undertook to put insulation coverage over every wire in the city where painters, contractors or others were working, it would have half of the city covered up and take a corps of inspectors and overseers beyond reason. This is particularly true where the city has gone and exceeded every requirement of the National Electrical Code in reconstructing the wiring of this particular building here involved, so as to put it beyond anything we have in any of the other cases at all.

Furthermore, we must consider the fact that Judge Henderson sat there and saw these two men testify, he heard what they said, he understood their demeanor as they did undertake to testify, and insofar as the record is here before us, I must admit that he could tell much more about whether these men had their memory affected by the injuries than we can by looking at the paper. On paper it doesn't seem like they are too badly disturbed mentally. If we could see them, we would have a much better idea whether it was a malingering problem or a memory problem. To me his direction of a verdict is correct and I would let it stand.

To do otherwise we make the electrical distributor an insurer against every accident that can happen to an individual by his current. Certainly there must be a stopping point somewhere. Particularly is this true with the expansion of electric energy to every purpose almost

known to man. Therefore, I feel constrained to dissent, and would affirm the judgment, notwithstanding the fact that the parties were most unfortunately injured.