ECKERD'S, INC., v. McGHEE (two cases).

Eastern Section.　June 15, 1935.

Petition for Certiorari denied by Supreme Court, October 12, 1935.

278

Lynch, Bachman, Phillips & Lynch, of Chattanooga, for plaintiff in error.

Sizer, Chambliss & Kefauver, of Chattanooga, for defendants in error.

FAW, P. J. The above-styled two cases were tried together by consent in the circuit court of Hamilton county, and have been brought to this court in one transcript and heard together here.

In one of the cases, Martha McGhee, a minor suing by her father as next friend, sued Eckerd's, Inc., to recover damages for personal injuries suffered by her as the result of swallowing certain poisons, viz., eight or nine bichloride of mercury tablets and a bottle of tincture of iodine which she had purchased from the defendant.

In the other of the two cases, W. E. McGhee, the father of said Martha McGhee, sued the same defendant for the loss of the services of his said minor daughter, and for doctors' bills and medical expenses incurred by reason of her injuries as aforesaid.

In this court Eckerd's, Inc., is plaintiff in error, but, for convenience, in this opinion, Martha McGhee and W. E. McGhee will be designated as plaintiffs, and Eckerd's, Inc., as defendant, according to the attitude of the parties on the record below.

The cases were tried to a jury upon the issues made by pleas of not guilty filed by defendant to the respective declarations of the plaintiffs, and the jury found the issues in favor of the plaintiffs and assessed the damages of Martha McGhee at $500, and the damages of W. E. McGhee at $250, and judgments were rendered accordingly.

In each of the two cases, the defendant, after its motion for a new trial had been overruled, appealed in error to this court.

It should have been stated that the defendant moved the court for a directed verdict in its favor at the close of the plaintiffs' evidence, and renewed the motion at the close of all the evidence.

In this court the defendant has assigned errors as follows:

1. "There was no evidence to support the verdict of the jury in either case."

2. "The court erred in overruling the defendant's motion for a directed verdict seasonably made at the close of the plaintiffs' evidence, and renewed at the close of all the evidence in each case, because:

" '(a) There was no evidence upon which the jury could properly base a verdict against this defendant.

" '(b) There was no evidence that the injuries alleged to have been sustained by the plaintiff Martha McGhee were proximately caused by any negligent act of the defendant, its agents or servants.

" '(c) The evidence shows that the plaintiff's injuries were solely caused by her own conscious and willful act in attempting to kill herself.' "

3. "Under all the proof the plaintiff Martha McGhee was guilty of such conduct so far transcending mere contributory negligence as to bar any recovery as a matter of law."

The declaration of Martha McGhee contains two counts. In the first count she sues the defendant for $15,000 as damages, and for cause of action avers that, on or about the 31st day of May, 1930, plaintiff, in a fit of despondency and temporary insanity to the extent that she did not realize or comprehend what she was doing, purchased from the defendant a quantity of poison in the form of bichloride of mercury tablets and tincture of iodine, and promptly swallowed some eight or nine bichloride of mercury tablets and an entire bottle of tincture of iodine, and when plaintiff came to her senses and realized what she was doing she had been taken to Erlanger's Hospital and treated for said poison, in the course of which necessary and proper treatment several of her jaw teeth had been broken and her mouth burned and lacerated and her stomach and intestinal tract burned and injured by said poison, etc. Plaintiff then described her injuries and sufferings, after which she further avers that defendant, through its servants and agents, was negligent, in that, the clerk or employee in defendant's store saw and knew, or by the exercise of reasonable care should have seen and known, that plaintiff was in a state of temporary insanity, so that she was not capable of comprehending what she was doing, and under the circumstances defendant knew, or by the exercise of reasonable care should have known, that plaintiff was likely to take said poison if defendant let her come into possession of same, but that defendant carelessly, negligently, and without regard to the consequences of its acts sold said poisonous substances aforesaid to the plaintiff and thus was directly responsible for plaintiff

becoming poisoned and for the resulting injuries and damages which plaintiff has received.

In the second count of her declaration plaintiff Martha M'cGhee adopts (by reference) the statements of the first count, and then avers further that she is and was at the time of the defendant's negligence as aforesaid a minor under 16 years of age, and that at such time there was in full force and effect a statute of Tennessee, being chapter 162 of the Public Acts of 1919 (section 18), which provides as follows:

"It shall not be lawful for any person to retail any poisons enumerated in Schedules A and B appended to this Act, unless, on inquiry, it is found that the purchaser is aware of its poisonous character, and that it is to be used for a legitimate purpose; nor to sell poisons to any person under the age of sixteen (16) years, except upon the written order of some responsible adult person. Nor shall it be lawful for any person to sell or deliver any of the poisons enumerated in said Schedules A and B without first labeling the box, bottle or package containing such articles with the common name of the poison with the word 'poison' and antidote for said poison, and the name and place of the seller. Nor shall it be lawful for any person to sell any of the poisons enumerated in Schedule A without, before delivering the same to the purchaser causing an entry to be made in a book kept for that purpose, which book shall be open to the proper authorities, stating date of sale, name and address of purchaser, name and quantity of poison sold, and the name of the dispenser; but they are hereby exempted from the registration of the sale of such articles when sold at wholesale, or to a registered pharmacist, or to a registered assistant pharmacist; but the provisions of this section shall not apply to the dispensing of poisons on the prescription of physicians, dentists or veterinarians, put up by registered pharmacist, assistant pharmacists, or dispensed by a physician, dentist or veterinarian in his regular practice.

"Any person violating the provision of this section shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not less than twenty-five ($25.00) dollars or more than one hundred ($100.00) dollars, and, in the discretion of the court, may be imprisoned not less than one (1) month, and not more than six (6) months, in addition to said fine.

"Schedule 'A.' Arsenic, atrophine, corrosive sublimate, potassium cyanide, chloral hydrate, hydrocyanic acid, belladonna, strychnia and its salts, phosphorous, oil bitter almond, cotton root and its preparations, ergot and its preparations, oil tansy, oil savan, cantharides and its tincture, aconite.

"Schedule 'B.' Carbolic acid, tincture of iodine, oxalic acid, the mineral acids digitalis and its preparations, colchicum, nux vomica,

croton oil, hellebore, henbane, strophanus, conicum and all other deadly poisons." .

Plaintiff Martha further avers (in the second count of her declaration) that "the very purpose of this statute was to prevent such occurrences as happened in her case, and that the defendant wilfully violated the provision of said statute in selling her the poisonous substances of bichloride of mercury and tincture of iodine without requiring her to have a written order from some responsible person, and as the direct and proximate results of defendant's violation of said statute plaintiff was injured and damaged as aforesaid."

The declaration of W. E. McGhee likewise contains two counts which, for all the purposes of the assignments of error, are identical with the declaration of Martha McGhee.

The question for decision here is, whether or not there was any material evidence which required the submission of the case to the jury. If there was such evidence, there was evidence to support the verdicts, for conflicts between witnesses and the weight of the evidence are matters peculiarly within the province of the jury.

The record shows, without dispute, that, late in the afternoon of May 31, 1930, plaintiff Martha McGhee swallowed nine bichloride of mercury tablets and a small bottle of tincture of iodine with suicidal intent, but she was hurried to Erlanger's Hospital (and a day or two later to Newell Sanitarium) and her life was saved. However, she claims that she suffered serious and permanent aftereffects for which she sought to recover damages, but as there is no assignment here that the amounts of the verdicts are excessive if the plaintiffs are entitled to recover at all, we need not discuss the extent of the injuries suffered by plaintiff Martha, or the evidence with respect to the expenses incurred by plaintiff W. E. McGhee.

The defendant's witnesses admit in their testimony that plaintiff Martha bought the bichloride of mercury tablets and the bottle of iodine at defendant's drug store in Chattanooga a few minutes before she swallowed them, but there are sharp conflicts in the testimony of plaintiff Martha and that of defendant's witnesses with respect to what occurred on that occasion.

According to undisputed proof for plaintiffs, Martha McGhee was born on February 11, 1915, and her age was, therefore, 15 years, three months and twenty days on May 31, 1930, the day on which she attempted to end her life as aforesaid. However, the effect of other undisputed testimony is that she was well-developed for one of the age stated, as one witness (Bogart) testified that she appeared to be 17 or 18 years of age—"a grown woman"— and another witness (Thomas) testified that she appeared to him to be a "grown woman eighteen or nineteen anyway."

Martha McGhee testified that her father's home, where she lived, was destroyed by fire on April 23, 1930, and everything the family had, including her own clothing, was burned; that she worried and brooded over this disaster a great deal, and, in the evening of May 31st, just after she had eaten supper with the family on Georgia avenue in Chattanooga, she went to her room to get ready to go down town and she realized that "some clothes" she "liked" she "didn't have" and that everything she had was gone, and she "got despondent" and decided to get some poison and kill herself; that she went first to the Volunteer Drug Store, but they would not sell her what she asked for; that she went next to Bogart's Drug Store, and then to Liggett's, and at each of those places they also refused to sell her what she asked for; that she then went to Eckerd's (the defendant) and asked for 50 cents worth of pure strychnine, and told the prescription clerk that she "wanted to take it"; that the clerk said: "I haven't got it but I have something that will do as well," and he handed her some blue tablets and a bottle of iodine. That she handed the clerk a $5 bill and he gave her "some ones and some other change" but that she "don't know how much he gave back;" that she came out of Eckerd's and went in an alley and took nine of the tablets and then drank the iodine and the next thing she knew she was in Newell's Sanitarium, and found that she had been there about a week.

Martha also stated that no one was with her when she bought the poison at defendant's drug store, that she had no written order, and that the clerk didn't make her "sign anything for it."

Clay Aytes testified for plaintiffs that during May, 1930, he was employed as a pharmacist at the Volunteer Drug Store in Chattanooga, that in the same evening and shortly before Martha McGhee drank some poison, she came into the Volunteer Drug Store and tried to buy 50 cents worth of arsenic from witness; that "her speech was nervous" and her "actions were nervous."

This witness also testified that "corrosive sublimate" (named in the Public Acts of 1919, chapter 162, supra) is the "same thing" as "bichloride of mercury;" that bichloride of mercury is sold for a number of normal uses as an antiseptic; that it is frequently used as an antiseptic by young women and older women, and is sold by druggists for that purpose; that it is not unusual for a young girl to come in and ask for bichloride of mercury, and he "wouldn't consider that anything out of the way" if her actions did not lead him to think otherwise; that iodine is used "for numerous legitimate purposes, bruises, cuts, sprains and household uses;" that it was the fact that Martha McGhee "asked for this large quantity of arsenic—enough to kill several persons—together with "her nervousness" that put him on his guard; that it is not uncommon for young women to ask for bichloride of mercury tablets, but she did not ask for them.

Frank Bogart, proprietor of Bogart's Drug Store, testified, as a witness for defendant, that Martha McGhee came to his drug store and wanted a bottle of bichloride of mercury tablets; that he said to her: "I don't have them, I don't make a habit of selling them to anybody," whereupon she (Martha) looked at him "kind of hard and walked out;" that she appeared to be seventeen or eighteen years old and "entirely normal;" that he did not notice anything out of the ordinary in her appearance that would lead one to think she was crazy or out of her head; that there was nothing in her appearance that caused him to decline to sell her the bichloride of mercury tablets, but that he has a rule to sell them only to regular customers.

According to the defendant's witnesses, the bichloride of mercury tablets and the iodine were sold to plaintiff Martha by P. E. Thomas, a clerk in the employ of defendant, from whose testimony we quote as follows:

"Q. Were you working for Eckerd's at the time Miss McGhee bought bichloride tablets? A. Yes.

"Q. Did you wait on her? A. Yes.

"Q. Please tell the jury just what happened when she came in. A. She came in the drug store, I was right at the back of the store, and she asked me for a bottle of bichloride of mercury tablets. I said 'All right.' We had swinging doors and I went back in the prescription room, and I said 'a lady wants a bottle of bichloride.' They both looked out, and Mr. Moore said 'she is all right, let her have them. Get her name and address and ask her what she is going to use them for.' I laid them down on the counter and tore off a piece of paper for her to put her name on. I asked what she wanted them for and she said an antiseptic wash. So, while I was writing it down she reached over and picked them up. She had on a white coat or suit, and she put them in her pocket. She had the correct change, 29 cents, and handed me 29 cents. I went back to give Mr. Moore her name and address for him to register it. As I came back out she was standing at the counter. She had been back behind the partition and picked up a bottle, an ounce bottle of iodine. She brought it on by, I was standing at the counter and Mr. Moore had just started out to the prescription room, and she pitched 25 cents on the counter. I said, 'I will wrap them up,' and she said she was in a hurry, that there was someone waiting for her, and wanted it. Just as she got to the other cash register I reached under the counter and gave Mr. Moore the book. I had already given her name and address and what she wanted it for.

"Q. You saw him register it in the book? A. Yes.

"Q. When she came in what was her appearance? A. Good. She looked all right. She wasn't excited about anything, nothing

wrong with her. She said she wanted bichloride tablets. She wasn't excited, and asked how much they were. I told her 29 cents and she had the correct change, laid down 25 cents and four pennies.

"Q. Did she look like a child or a grown woman? A. Grown woman 18 or 19 anywây was rather the way she appeared to me.

"Q. Specifically, I will ask you if she asked for strychnine? A. No, sir.

"Q. She claims she asked you for that and you said 'No, I have something that will do just as good.' A. That didn't occur.

"Q. Did she say anything to indicate to you she was going to use these things for improper purposes? A. No, she didn't say anything out of the way to think she was going to commit suicide. She wanted them and knew what she was going to do with them.

"Q. What did she say she wanted them for? A. For an antiseptic wash.

"Q. I will ask you if these bichloride tablets are commonly used by young women for that purpose? A. Yes.

"Q. You have frequent calls for them for that purpose? A. Yes.

"Q. At Eckerd's and Martin's and anywhere you work? A. Yes, any drug store sells them.

"Q. What about iodine? Has that any common, ordinary use? A. Yes.

"Q. All drug stores have it on the counters? A. Yes."

On cross-examination, the witness Thomas stated that he made no inquiry of Martha as to her age; that he knew it was against the law to sell bichloride of mercury and iodine to people under the age of sixteen years without a written order; and that he said nothing to her about it being poison but that "she knew it was poison."

Dr. Robert H. Moore, a witness for defendant, testified that he is a registered pharmacist and held the position of chief pharmacist at defendant's drug store at the time Martha McGhee made the purchase in question; that when Miss McGhee came in he looked at her and she looked very composed; that she was an average aged woman that would buy such things; that Mr. Thomas called his attention to her and give him a "slip" showing her name and residence, and he then and there made an entry in the register, which register he produced and from which he read to the court and jury said entry, as follows: "Martha McGhee, 730½ Georgia Avenue, Biehl 25—7½ Moore Ant. Wash. That is my name, 'Moore' "; that he made the entry while Martha McGhee was still in the store and on her way out; that he had no conversation with her and the only information he got was from Mr. Thomas and from his own "observation," that the bichloride tablets were in a coffin-shaped bottle with the word "Poison"

written on it and the bottle bore a red label with skull and cross-bones on it, and also had an "antidote" written on it.

Martha McGhee did not admit that P. E. Thomas was the man who sold her the poison at defendant's drug store. Her testimony on this subject is as follows:

"Q. Stand up, Mr. Thomas. (P. E. Thomas stands up.) Is that the young man that sold you that stuff? A. No, sir, I don't think he is.

"Q. Do you remember whether the man that sold you was a young or old man? A. An old, bald-headed man. There he sits now. He had on glasses, he was old.

"Q. Would you have the jury believe that man, as old as this gentleman, middle aged, would say to a young girl coming in, if that girl asked him for a deadly poison, 'no, I have not got it, but I will give you something that will kill you just as well,' and give you something to kill yourself with? A. He said that."

The witness Dr. Moore testified that there was no "elderly bald-headed man" working at Eckerd's at the time Martha McGhee made the purchase in question; that there was such a man working there at the time of the trial, but that "he came there after this happened."

The witness Thomas described Dr. Moore as a tall man about 35 years of age, with curly hair and a little moustache, that he "wears kind of dark glasses" and is not bald-headed.

In rebuttal plaintiff W. E. McGhee stated that Dr. Bogart (defendant's witness) told him that when Martha came into his place she asked for "fifty cents worth of straight strychnine." This had been denied by Dr. Bogart. Minnie Lester (Martha's sister) also contradicted Dr. Bogart on the same point.

Minnie Lester also testified in rebuttal that Dr. Moore told her on the morning following Martha's attempted suicide that Martha told him she wanted to take this poison and he just thought that she was joking. Dr. Moore had previously denied that he made such statement.

Mr. Estes Kefauver, a member of the Chattanooga Bar, was introduced by plaintiff in rebuttal for the purpose of contradicting defendant's witness P. E. Thomas, but declined to do so, as will be seen from the following question and answer:

"Q. Did he tell you in substance that the girl told him she was going to take this poison, but that he thought she was just joking, and wanted to use this as an antiseptic? A. I want to be perfectly frank. I was of the impression he told me that, but he denies it, takes the stand and says he did not, and I am not going to say he did."

We have not stated the evidence on behalf of defendant with the view of weighing it against opposing evidence for plain-

tiffs. That is not within our province in a jury case. However, we may properly take into consideration any and all evidence admitted on behalf of defendant that is not contradicted by, nor inconsistent with, the evidence for plaintiffs.

It is seen that defendant sold bichloride of mercury tablets and tincture of iodine to a person under the age of 16 years, without the written order of some responsible adult person, and thus violated the Public Acts of 1919, chapter 162, pleaded in plaintiffs' declarations. Such violation of the statute was negligence per se, and if it was the proximate cause of the injuries suffered by plaintiffs, defendant is liable therefor. Wise & Co. v. Morgan, 101 Tenn., 273, 278, 48 S. W., 971, 972, 44 L. R. A., 548.

Although the principles above stated are laid down in the case just cited, the essential facts of that case are not parallel with the facts of the instant case. In the cited case, the druggist sold a poisonous substance without labeling it as such and without the knowledge of the purchaser that it was poisonous. The purchaser's three year old child drank the contents of the bottle and died as a result thereof. In the midst of the opinion in that case the court said:

"But it is insisted that the mother's negligence in leaving the bottle accessible to the child was such intervening negligence on the part of a responsible agent as broke the chain of causation, and became itself the juridical cause. This might be so, if the mother had been aware of the poisonous character of the substance; but it is not claimed she had such knowledge, and her testimony is quite positive that she was ignorant of it. If the bottle had been labeled 'Poison,' the mother would thereby have been admonished of its dangerous character, and doubtless would not have left it exposed. The fact that the mother was ignorant of the ingredients in the mixture is made clear by the fact that when she discovered the child had swallowed it she was not alarmed, and did not deem it necessary at once to call in a physician. If the bottle had been labeled 'Poison,' the mother, on discovering the child had taken it, would have immediately taken steps to counteract the deadly potion. Nor can the act of the child in getting down the mixture from the mantelpiece, and drinking it, be invoked as an intervening and independent juridical cause. The child was an irresponsible agent. It had not reached years of discretion, and negligence was not imputable to it. The case of Meyer v. King, 72 Miss., 1, 16 So., 245 [35 L. R. A., 474], cited by counsel for plaintiffs in error, and other like cases, are easily distinguishable from this one, in the important feature that each presented an intervening, responsible agent, that broke the chain of causation, so that the death could not be concatenated with the breach of the statute."

The case of Meyer v. King, 72 Miss., 1, 16 So., 245, 35 L. R. A., 474, cited in the above-quoted excerpt in the opinion in Wise & Co. v. Morgan, was an action by a mother against a druggist to recover damages for the death of her son which had resulted from drinking chloroform sold to him by the defendant druggist in violation of a statute of Mississippi that forbade the sale of chloroform to minors. Finding that it sufficiently appeared from the declaration that the plaintiff's minor son had reached the years of discretion, and that he knowingly and voluntarily drank the chloroform, the court held that his act in drinking the chloroform, and not the act of the druggist in selling it to him, was the proximate cause of his death. See also, McKibbin v. Bax & Co., 79 Neb., 577, 113 N. W., 158, 13 L. R. A. (N. S.), 646, 126 Am. St. Rep., 677; King v. Henkie, 80 Ala., 505, 60 Am. Rep., 119.

In the instant case, we are of the opinion that the act of Martha McGhee in swallowing the bichloride tablets and iodine was the proximate cause of her injuries, unless her reason and memory were, at the time, so far obscured that she did not know and understand what she was doing, and was, therefore, not a responsible human agency.

The learned trial judge seems to have entertained the view just stated, for he charged the jury as follows:

"If you conclude from the evidence that this girl knew this was poison, and she voluntarily swallowed this bichloride and iodine, she cannot recover in this case. The mere fact that she swallowed it don't give her the right to recover in this case. The proximate cause must have been the negligence of the defendant in furnishing it to her if while she was temporarily insane and not at herself, and the defendant must have known it or by the exercise of reasonable care must have known it by her appearance and condition. It would be the duty of the defendant to exercise reasonable care under those circumstances not to furnish poison of this sort to this girl, not to sell it to her or permit her to have it if she was delirious, hysterical and temporarily crazy, and if they did that, and she immediately took it or soon thereafter swallowed it while in that condition, then the defendant would be liable for the negligent act; they would be guilty of negligence for letting it come in her possession if by reasonable care they should have known she was not in mental condition to take possession of it; and under the count predicated on the statute, if they sold this iodine and bichloride that would be a violation of the statute if she was under 16 at the time, unless she had a written order from some responsible person, and if they did that, that is negligence in and of itself, and if the plaintiff soon thereafter swallowed this poison, if she was in the condition claimed by her, then they would be liable under that statute by reason of the violation of the statute, but as stated,

if this girl got this poison for the purpose of killing herself, went out and voluntarily took it, she cannot recover, and neither could the father under the circumstances.''

In the light of the above-quoted instructions to the jury, we assume that the trial judge overruled defendant's motion for peremptory instructions, and later its motion for a new trial, upon the assumption that there was evidence that Martha McGhee was mentally incompetent to know and understand what she was doing when she swallowed the poison. In taking this view of the evidence, we think the learned trial judge fell into error.

It is, we think, quite clear from the plaintiff's evidence that Martha McGhee voluntarily formed a purpose to end her life by means of poison, and that she intelligently sought and procured the poison which she thought necessary to accomplish that purpose, and then promptly swallowed the poison, with full knowledge of what she was doing, and in the belief that it would destroy her life. All of this is a necessary inference from the recital in her testimony of her search for and the purchase and swallowing of the poisonous drugs, together with the undisputed testimony of other witnesses relating to her conduct while searching for the desired poison.

That she knew full well what she was doing, and the purpose for which she was doing it, is not only inferable from her intelligent account of what she did, but she practically admits as much in her testimony, from which we quote as follows:

''Q. You remember distinctly the route you took and the drug stores you went to? A. Yes.

''Q. That is correct, is it? A. Yes.

''Q. Then, when you got through, your mind was fully made up, and you knew exactly what you were going to do. Your mind was fully made up what you were going to do?

''Mr. Sizer: I don't think he should argue with the witness.

''Mr. Lynch: I want the facts.

''Q. Did you or not know exactly what you were doing when you went in Eckerd's that night? A. If I knew what I was doing?

''Q. Yes, and whether you made up your mind what you were fully going to do. That is all I want to know? A. Yes, I had made up my mind.

''Q. You knew what you were doing? A. To a certain extent.

''Q. You knew the girl you talked to? A. No, I never saw her before.

''Q. You knew when you went there you remember distinctly everything you said to the man, when you asked for the poison. A. Sure.

''Q. You remember everything he said, that is all quite clear? A. Yes.

"Q. Your purpose was clear. You knew what you were doing?
A. Yes. . . .

"Q. When you bought this bichloride of mercury, those tablets, and the bottle of iodine from the defendant, what did you do with it? A. I took nine of them.

"Q. Nine of those tablets? A. Yes.

"Q. What did you do with the iodine? A. I drank it after I took the tablets."

Cross-examination by Carter J. Lynch:

"Q. Where did you do this? A. Between the Southern Dairies and the old Palace.

"Q. You went by the Home Plate restaurant? A. No.

"Q. You went down the street, turned the corner and went back in the alley? A. Yes.

"Q. You took the tablets then took a gulp of iodine? A. Yes.

"Q. Then where did you go? A. I didn't go anywhere.

"Q. Didn't you rush in the Home Place, and tell them you poisoned yourself? A. No, sir.

"Q. Why didn't you say awhile ago that you didn't know anything from the time you left Eckerd's until you arrived at Newells? A. I said after I took the poison I didn't know anything until I woke up at Newells."

The record contains no testimony of alienists or medical experts touching the mental condition of plaintiff Martha, and we find no facts in the record which afford a reasonable basis for an inference that she was insane or mentally incompetent to the extent that she did not know and comprehend the full import and consequences of what she was doing at the time in question. Fitch v. American Trust Co., 4 Tenn. App., 87, 94, 102.

While ordinarily the decision of a question of this character would naturally fall within the province of the jury, "yet where the facts are fairly incontrovertible the question of proximate or intervening cause is for the court." Chattanooga Light & Power Co. v. Hodges, 109 Tenn., 331, 341, 70 S. W., 616, 618, 60 L. R. A., 459, 97 Am. St. Rep., 844.

It results that the defendant's assignments of error are sustained and the judgments of the circuit court in the two cases brought up in this record are reversed, the verdicts are set aside, and the plaintiffs' suits are dismissed.

The costs of the two cases, including the costs of the appeal, will be adjudged against W. E. McGhee, the plaintiff in one case and the next friend of the plaintiff in the other case.

Crownover and DeWitt, JJ., concur.