IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
November 16, 2010 Session

## ROBERT D. GRAY v. ANDY B. ROTEN, II and GARY B. ROTEN

**Direct Appeal from the Circuit Court for Shelby County**
**No. CT-004812-05     Kay S. Robilio, Judge**

**No. W2010-00614-COA-R3-CV - Filed January 18, 2011**

This case involves an accident between a bicycle and a pick-up truck. Appellant was struck by Appellee's truck when Appellant failed to obey a stop sign and rode his bicycle into traffic. The trial court found that Appellant was sixty percent at fault for the accident, and, pursuant to a comparative fault analysis, entered judgment for Appellee. On appeal, we find that the trial court erred in applying a pedestrian statute to a bicyclist, but that this error was harmless in light of our finding that Appellant was negligent *per se* in failing to obey the stop sign, and/or in failing to yield to oncoming traffic. We conclude that the evidence preponderates in favor of the trial court's finding that Appellant was at least sixty percent at fault so as to foreclose any recovery under a comparative fault analysis. Affirmed for the reasons discussed herein.

**Tenn. R. App. P. 3. Appeal as of Right; Judgment of the Circuit Court Affirmed**

J. STEVEN STAFFORD, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and HOLLY M. KIRBY, J., joined.

A. Wilson Wages, Millington, Tennessee, for the appellant, Robert D. Gray.

Sam R. Marney, III and Matthew S. Russell, Germantown, Tennessee, for the appellees, Andy B. Roten, II and Gary B. Roten.

## OPINION

On or about September 8, 2004[1], Robert D. Gray ("Plaintiff," or "Appellant"), who was sixty years old at the time, was riding his bicycle in Millington on Juana Street, near its

---

[1]Plaintiff's complaint states that the accident occurred on September 8, 2003. However, it appears from the record that this is a typographical error, and the actual date of the accident was September 8, 2004.

intersection with Raleigh-Millington Road. Neither bike lanes nor crosswalks are present at this location. However, there is one stop sign, signaling those traveling on Juana Street to stop before entering Raleigh-Millington Road. According to the testimony, Mr. Gray frequently rode his bicycle around Millington. George Adams, Mr. Gray's brother, testified that Mr. Gray suffered from a mental disability; however, there is no evidence in the record concerning Mr. Gray's exact diagnosis. Mr. Gray was apparently unable to hold a full-time job but took odd jobs from local business owners and collected aluminum cans for recycling. His primary support came from SSI benefits; however, the record is silent as to why he was eligible for SSI. It appears that prior to the accident Mr. Gray was able to take care of his own basic needs and was able to live on his own.

Andy B. Roten, II, who was nineteen years old at the time of the accident, was driving a 1989 Ford F-150 truck, which was titled in his father, Gary B. Roten's (together with Andy Roten, "Defendants," or "Appellees") name. Both Andy and Gary Roten testified that, although Andy Roten had paid his father for the truck, the title had not been transferred and remained in Gary Roten's name at the time of the accident. As Andy Roten traveled North on Raleigh-Millington Road, Mr. Gray emerged from Juana Street, and attempted to cross Raleigh-Millington Road on his bicycle. Despite Andy Roten's efforts to brake, his truck made impact with Mr. Gray in the left-hand, northbound lane of Raleigh-Millington Road. Mr. Gray sustained significant injuries as a result of the accident. Mr. Gray's sister, Lottie Johnson, testified that Mr. Gray came to live with her after the accident. Ms. Johnson also testified that, since the accident, her brother was no longer self-sufficient, and specifically that he can no longer ride his bike or walk on his own, and that he is unable to perform his most basic needs.[2]

On or about September 8, 2005, Mr. Gray filed a complaint against the Rotens in the Shelby County Circuit Court, alleging negligence and negligence *per se* against Andy Roten, for which Gary Roten was allegedly vicariously liable under theories of *respondeat superior* and/or the Family Purpose Automobile Doctrine. On or about October 20, 2005, the Rotens filed their answer, in which they admitted that the accident occurred and that Andy Roten was operating the vehicle. However, the Rotens denied liability and invoked the doctrine of comparative fault. Specifically, the Rotens alleged that Mr. Gray had caused or contributed to the accident by riding his bicycle into the path of the Roten vehicle. The Rotens further alleged that Andy Roten had neither time, nor space, to avoid Mr. Gray's bicycle. On or about July 13, 2007, a consent order was entered, allowing Mr. Gray's brother, George

---

[2] We note that Ms. Johnson's testimony concerning Mr. Gray's inability to take care of his basic needs was refuted when Mr. Gray (during Ms. Johnson's direct testimony) walked out of the courtroom, on his own volition and without assistance, apparently to use the restroom. This fact was brought to the court's attention when used as rebuttal on cross-examination of Ms. Johnson by Defendants' counsel.

Adams, to be added to the complaint as next friend of Mr. Gray. This amendment was allowed "due to the belief of defense counsel that Plaintiff Robert Gray is mentally incompetent."[3]

When mediation attempts failed, the case was tried by the court, sitting without a jury, on February 16 and 17, 2009. On March 13, 2009, the trial court entered judgment in favor of the Rotens, specifically finding:

> 1. That liability for the incident that is the subject of this cause of action should be split with 60% assessed to Plaintiff Robert Gray and 40% assessed to the Defendants;
>
> 2. That the Plaintiff would have been entitled to compensatory damages in the total amount of $125,000.00 based upon the testimony at trial as to how this accident has affected Robert Gray and total medical bills of $64,862.65, which the Court finds to be necessary, reasonable, and causally related to the accident;
>
> 3. That the testimony and exhibits from Frank Palumbo and Mike Rzesutock were too problematic to assist Judge Robilio in assessing fault;
>
> 4. That the Plaintiff had a duty to keep a proper lookout, which he failed to do;
>
> 5. That the Plaintiff committed negligence *per se* by attempting to cross Raleigh-Millington Road where there was no crosswalk;
>
> 6. That the Plaintiff had the last clear chance to avoid the accident by waiting until traffic on Raleigh-Millington Road had cleared;
>
> 7. That the Defendant Andy Roten had the right to assume that the Plaintiff would obey traffic laws; and

---

[3] At the hearing, counsel for the Rotens noted to the court that the amended complaint, although allowed, had not been entered, and the parties discussed filing that amendment as soon as possible. However, from our review of the record, it does not appear that the filing was made. Whether the amended complaint adding Mr. Gray's brother as his next friend was filed does not directly bear on this appeal.

8. That the defense witnesses, Paul Collins and Howard Glasper, were credible, especially Howard Glasper's testimony that Andy Roten was driving the speed limit, and that Mr. Glasper was attentive to speed limits because he possessed a commercial driver's license and did not want to receive citations for driving in excess of the speed limit so that he would not lose his commercial driver's license.

IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED that based upon the Plaintiff's 60% fault and the comparative fault laws of the State of Tennessee, the Plaintiff is not entitled to recover any damages from the Defendants; a judgment is awarded for the Defendants; and the case is hereby dismissed at Plaintiff's cost....

On April 13, 2009, and October 8, 2009, respectively, Mr. Gray filed a motion and a supplemental motion to alter or amend the judgment and/or for a new trial, which were heard by the trial court on February 5, 2010, and subsequently denied by order of February 19, 2010. Mr. Gray appeals. We note at the outset that Mr. Gray's statement of the issues presented for appeal fails to comport with Rule 6 of the Rules of the Court of Appeals of Tennessee. Nevertheless, in the interest of expediting this matter, we suspend this requirement and discern the relevant issues to be:

1. Whether the trial court erred in failing to find that Andy Roten violated Tenn. Code Ann. § 55-8-136?

2. Whether the trial court erred in finding that Mr. Gray was negligent *per se*?

3. Whether the weight of the evidence preponderates against the trial court's finding that Mr. Gray was 60% at fault in the accident?

Because this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R. App. P. 13(d). Furthermore, when the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses and their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *See **McCaleb v. Saturn Corp.**, 910 S.W.2d 412, 415 (Tenn.

-4-

1995); ***Whitaker v. Whitaker***, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997).  The weight, faith, and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. ***Whitaker***, 957 S.W.2d at 837; *see also* ***Walton v. Young***, 950 S.W.2d 956, 959 (Tenn. 1997).

## Negligence

### A. *Applicability of Tenn. Code Ann. § 55-8-136.*

Throughout these proceedings, Mr. Gray has asserted that Andy Roten violated Tenn. Code Ann. § 55-8-136, which provides, in relevant part, as follows:

> (a) Notwithstanding the foregoing provisions of this chapter, every driver of a vehicle shall exercise due care to avoid colliding with any pedestrian[4] upon any roadway, and shall give warning by sounding the horn when necessary, and shall exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway.

In the first instance, the record clearly establishes that Mr. Gray was not, in fact, a pedestrian at the time of the accident; rather, all of the witnesses to the accident testified that Mr. Gray was actually riding the bicycle when it collided with the Roten truck.  Howard Glasper, who was driving his vehicle directly behind the Roten truck at the time of the accident, testified that Mr. Gray "just rolled out" from Juana onto Raleigh-Millington Road and that Mr. Gray was riding the bicycle at that time.  Paul Collins, who was waiting to turn left onto Juana, also witnessed the accident and testified that Mr. Gray was riding his bike. Andy Roten testified that he observed Mr. Gray on the bicycle, and that it appeared that Mr. Gray was going to make a right turn onto Raleigh-Millington, to proceed North along the curbside.[5]  Andy Roten further testified that Mr. Gray suddenly changed direction, proceeding across Raleigh-Millington, where he collided with the Roten truck.

Concerning the possibility that Mr. Gray was actually walking and pushing the bicycle (so at to make the foregoing statute applicable), there is only one mention of this possibility in the record, and that is in the opening statement made by Mr. Wages, the attorney for Mr.

---

[4] Tenn. Code Ann. § 55-8-101(40) defines a "Pedestrian" as "any person afoot or using a motorized or non-motorized wheelchair."

[5] As set out above, the trial court specifically found that the testimonies of Messrs. Glasper and Collins were credible.

Gray. Mr. Wages stated that there was some confusion as to whether Mr. Gray was riding the bicycle, or walking alongside it. It is well settled that the arguments of counsel and the recitation of facts contained in a brief, or a similar pleading, are not evidence. *Price v. Mercury Supply Co., Inc.*, 682 S.W.2d 924, 929 n. 5 (Tenn. Ct. App. 1984). The same is true of statements made by counsel during the course of a hearing, trial, or argument in this Court. *Trotter v. State*, 508 S.W.2d 808, 809 (Tenn. Crim. App. 1974); *Davis v. State*, 673 S.W.2d 171, 173 (Tenn. Crim. App. 1984). Nonetheless, in the instant case, the record simply does not support Mr. Wages' statement. Rather, all witnesses testified that Mr. Gray was riding his bicycle. Consequently, the evidence preponderates in favor of a finding that Mr. Gray was not a pedestrian at the time of the accident.

Tenn. Code Ann. § 55-8-136 also requires drivers to "exercise proper precaution upon observing any child or any confused or incapacitated person upon a roadway." While Mr. Gray's alleged mental impairment is discussed in more detail below, there is simply no evidence in the record to support a finding that Andy Roten should have been aware of this fact based upon any actions by Mr. Gray preceding the accident. Although it is undisputed that Andy Roten did not sound his horn prior to the accident, he was not obligated to do so unless Mr. Gray was exhibiting signs of confusion or incapacitation. *See, e.g., Kim v. Boucher*, 55 S.W.3d 551, 558-59 (Tenn. Ct. App. 2001), *perm. app. denied* (Tenn. 2001). However, even if we assume, *arguendo*, that Andy Roten violated the foregoing statute in failing to sound his horn, it is well settled that "[l]iability cannot be predicated upon mere violations of a statute, ordinance, or regulation unless it affirmatively appears that such violation was the proximate cause of the injury." *Long by Cotten v. Brookside Manor*, 885 S.W.2d 70, 73-74 (Tenn. Ct. App.1994) (citing *Biggert v. Memphis Power and Light Co.*, 80 S.W.2d 90, 92 (Tenn. 1935)). As noted above, Andy Roten's undisputed testimony was that Mr. Gray appeared to veer as though he was going to turn northbound, then suddenly changed direction to come across Raleigh-Millington Road. When Mr. Gray started to cross in front of the Roten truck, Andy Roten testified that he locked his brakes, and that all of this occurred in a "split second." Consequently, the evidence supports a finding that, even if Andy Roten had time to sound his horn, this action would not have stopped the collision.

### B. *Speeding*

The trial court found that Andy Roten was not speeding at the time of the accident. In his brief, Mr. Gray asserts that this finding was in error. We disagree. The only evidence that Andy Roten was traveling in excess of the forty-mile-per-hour speed limit was the testimony of Mr. Gray's accident reconstruction expert, Frank Palumbo. As set out in its order, the trial court specifically found that the testimony proferred by Mr. Palumbo was "too problematic to assist . . . in assessing fault." We cannot overlook the fact that the trial court also discounted the testimony of the Rotens' expert, Michael Rzesutock. The weight, faith,

and credit to be given to any witness' testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See Whitaker*, 957 S.W.2d at 837; *see also Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997). In making their speed calculations and in forming their respective opinions, both Mr. Palumbo and Mr. Rzesutock relied upon the length of the skid marks as noted in the police accident report. However, neither expert could testify as to the accuracy of the information in the police report, which was their only source of information regarding the length of the skid marks. Although the record reveals that the police officer who made the report was waiting outside the courtroom to testify, he was not called to testify. We note that the police accident report was marked as Trial Exhibit 2; however, it does not appear that the report was actually admitted into evidence.[6] Regardless, without the police officer's testimony, the report was hearsay, and the trial court correctly disregarded the expert testimony based upon the report.

Moreover, both experts testified that they relied upon photographs in making their calculations and in forming their respective opinions. However, in a sidebar between the attorneys and the court, it became apparent that the experts were not using the same photographs. With that disclosure, the trial court specifically questioned the validity of both experts' testimonies.

Perhaps most problematic for the trial court were the experts' testimonies concerning the co-efficient of friction of Raleigh-Millington Road. Mr. Rzesutock explained that the co-efficient of friction describes the degree to which a roadway is sticky or slippery, and that the co-efficient of friction changes over time as the road changes due to use. The experts disagreed on the appropriate co-efficient of friction that should be used in their calculations. Mr. Palumbo made four separate speed calculations, using co-efficient of friction values of .65, .75, .86, and .95. Mr. Rzesutock performed his calculations and formed his opinion based upon a range of co-efficient of friction values from .65 to .75. Furthermore, exhibits show that Mr. Palumbo made his calculations in 2007, three years after the accident, and that Mr. Rzesutock made his calculations in 2008, four years after the accident. Moreover, neither of the experts actually performed any testing on the section of Raleigh-Millington Road where the accident took place. The trial court questioned both experts regarding the appropriate co-efficient of friction and correctly observed that both of the experts were making certain assumptions. Concerning assumptions made by expert witnesses, our Supreme Court has held:

> Expert opinions, at least when dealing with highly complicated

---

[6]It is well settled that police reports are inadmissible hearsay. Tenn. R. Evid. 803(8), Advisory Comm'n Cmts.; *see McBee v. Williams*, 405 S.W.2d 668 (Tenn. Ct. App. 1966) (construing Tenn. Code Ann. § 55-10-114(b)).

and scientific matters, are not ordinarily conclusive in the sense that they must be accepted as true on the subject of their testimony, but are purely advisory in character and the trier of facts may place whatever weight it chooses upon such testimony and may reject it, if it finds that it is inconsistent with the facts in the case or otherwise unreasonable. Even in those instances in which no opposing expert evidence is offered, the trier of facts is still bound to decide the issue upon its own fair judgment, assisted by the expert testimony.

*Gibson v. Ferguson*, 562 S.W.2d 188, 189-90 (Tenn. 1976) (citation omitted); *see also Thurmon v. Sellers*, 62 S.W.3d 145, 162 (Tenn. Ct. App. 2001), *perm. app. denied* (Tenn. 2001). Because both experts' testimonies were based more on assumption than fact, we find that the trial court did not err in discounting the testimony of both experts.

Giving no credence to the testimonies of Messrs. Palumbo and Rzesutock, the only other testimony concerning Andy Roten's speed came from the witnesses to the accident. Mr. Collins testified that he was facing southbound, waiting for traffic to clear, before turning left onto Juana Street. According to Mr. Collins, it "seemed" that the Roten truck was "going at a normal speed." Howard Glasper testified that he was driving northbound behind the Roten truck. Mr. Glasper stated that he was always cognizant of the speed limits, and that he always tried to abide by them because he had a commercial driver's license, which could be revoked for more than three speeding citations. Mr. Glasper testified that he and the Roten truck were traveling "at about the same speed." Given the testimonies of Messrs. Collins and Glasper, we conclude that the evidence preponderates in favor of the trial court's finding that Andy Roten was driving the speed limit at the time of the accident.

## C. *Mr. Gray's Negligence*

Turning to the trial court's finding that Mr. Gray was negligent *per se* in that he failed to use a crosswalk, it appears that the trial court relied upon Tenn. Code Ann. § 55-8-135(a), which provides:

> Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right-of-way to all vehicles upon the roadway.

As discussed above, Mr. Gray was not a pedestrian at the time of the accident; consequently, the trial court erred in applying Tenn. Code Ann. § 55-8-135(a). Although it

was plain error for the trial court to treat Mr. Gray as a pedestrian, this error does not, itself, negate the trial court's finding that Mr. Gray was negligent.

Tenn. Code Ann. § 55-8-172(a) governs the rights and duties of bicyclists, and provides:

> Every person riding a bicycle upon a roadway is granted all of the rights and is subject to all of the duties applicable to the driver of a vehicle by this chapter....

Turning to the record, Paul Collins testified, in relevant part, as follows:

Q. All right. And tell us what you saw happen.

A. ...I was sitting there waiting to turn, and I saw [Mr. Gray] on his bicycle riding his bicycle, and...I wasn't thinking much about it.... And I was waiting to turn, and [Mr. Gray] kept riding his bicycle coming out to the road [i.e., Raleigh-Millington Road]. I still didn't think much of it, but, you know, he didn't stop. He kept coming. So, I thought, well, maybe, you know, he probably should have stopped and looked.
   Well, he just kept peddling out into the road. And at that point, I saw the truck come and–out of the corner of my eye. And then, the guy driving the truck, he slammed on his brakes and he slid and hit [Mr. Gray] on the bicycle.

\*                         \*                         \*

Q. And was [Mr. Gray] going slow, medium, fast?

A. It was like a medium speed. It didn't seem like [Mr. Gray]–it didn't seem like he had slowed down or looked or anything when I saw him. So, I thought it was kind of strange because if I ever cross the road over there, I would look kind of both ways to avoid something like that.

Q. Did the bicycle rider look up and down Raleigh-Millington before riding his bike out in the street?

A. From what I saw, he didn't. He didn't look like it, because

-9-

it looked like he was just looking straight ahead.

Likewise, Howard Glasper testified that Mr. Gray did not appear to obey the stop sign on Juana:

> Q. ...What happened in front of you.
>
> A. ...We was [sic] going down Raleigh-Millington and we got to the intersection [of Juana and Raleigh-Millington], and a guy just rolled out, you know, in the middle of traffic on a bike.
>
> *                              *                              *
>
> Q. ...And you and the pick-up truck in front of you approached that intersection, you said a bicycle came out.  Please give us more detail.  Where did the bicycle come from?
>
> A. The bicycle came from the–off the side street [i.e., Juana]....  The only thing I can say is the bicycle came off the side street on to Raleigh-Millington Road.
>      And you know, like he [i.e., Andy Roten] was already in the intersection....  And...I will put it like this.  If [Andy Roten] hadn't hit [Mr. Gray], I would have hit him.
>
> *                              *                              *
>
> Q. ...Now, the bicycle, was it on the side street or was it on the sidewalk or do you know?
>
> *                              *                              *
>
> A.  Street.  He was on the street.
>
> *                              *                              *
>
> Q.   And is there any traffic device that controls the traffic coming from the direction that the bicycle was coming from?
>
> A.  No more than a stop sign.

Q. There is a stop sign?

A. Yes.

Q. For traffic coming from the side street [i.e., Juana] on to Raleigh-Millington?

A. Yes.

Q. Did the bicycle stop?

A. He didn't stop at all.

Q. Did you see whether the bicyclist looked at traffic on Raleigh-Millington before riding out into the street?

A. Well, he–I don't think he looked. It looked like he just–he was just looking straight ahead, you know, like it wasn't no [sic] traffic coming, you know, neither way, you know. It was like he was just riding like nobody else was[] out there but him.

The testimonies of Messrs. Collins and Glasper corroborate that of Andy Roten:

Q. Why don't you take us through what happened?

A. I was heading northbound on Raleigh-Millington in the left lane. I was approaching Juana. And there is a line of trees and a house on the right. So, you can't really see down Juana very well.
 And there is a car fixing to make a left turn on to Juana [i.e., this was Mr. Collins' vehicle]. And right as I was getting–approaching the intersection, there was a bicyclist coming from my right. And he started to veer like he was going to go northbound on Raleigh-Millington along the curbside. And right as I came up on the intersection, he just veered straight across the left, going over towards the southbound traffic.

Q. Did you see whether the bicycle was on the sidewalk or the street?

-11-

A. The street.

\*                                    \*                                    \*

Q. Did you notice what the bicycle was doing before he swerved to the left towards you?

A. I don't know what he was doing. It looked like he was going to turn along the curbside and go northbound on Raleigh-Millington.

Q. Okay. At what point did you put on your brakes and what was the bicyclist doing when you put on your brakes?

A. Right as he went to turn across to the other side of traffic....
I mean, a split second after I hit the brakes, I [made] impact[] with Mr. Gray.

Mr. Gray did not testify in this case; consequently, the only testimony concerning the accident is the foregoing. The preponderance of the evidence supports a finding that Mr. Gray failed to obey the stop sign on Juana Street, and otherwise failed to yield to oncoming traffic on Raleigh-Millington Road.

As set out above, Tenn. Code Ann. § 55-8-172(a) subjects bicyclists to the same traffic laws that must be followed by every motorist. Consequently, Mr. Gray's failure to either stop at the end of Juana, or his failure to keep a proper watch and yield to the northbound Raleigh-Millington traffic supports a conclusion that he was negligent in the accident. Because the evidence preponderates in favor of a finding that Mr. Gray disobeyed the traffic laws, the trial court's finding that he was negligent *per se* is correct, although the trial court erred in applying the pedestrian statute. It is well settled that "if the trial judge reached the right result for the wrong reason, there is no reversible error." **Shutt v. Blount**, 249 S.W.2d 904, 907 (Tenn. 1952).

Having determined that the evidence preponderates in favor of a finding that Mr. Gray failed to observe the stop sign on Juana, and that he further failed to yield to oncoming traffic on Raleigh-Millington Road, it would appear that these negligent acts were the cause in fact of his injuries. This is especially true in light of the fact that Andy Roten was not in violation of any statute, and that he was not speeding. Our inquiry would normally end here, with our affirming the trial court's finding that Mr. Gray was more culpable in a comparative fault analysis. However, there are two issues warranting further discussion.

-12-

We first address the trial court's finding that Mr. Gray "had the last clear chance to avoid the accident by waiting until traffic on Raleigh-Millington Road had cleared." In the case of *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992), our Supreme Court held that the common-law doctrine of last clear chance was subsumed into Tennessee's system of comparative fault. However, the Court did allow that "circumstances formerly taken into account [under the last clear chance doctrine] will henceforth be addressed when assessing relative degrees of fault." *Id*. Consequently, last clear chance "circumstances" are now but one of many factors to be considered by the trier of fact in assigning percentage of fault to each party. *See Eaton v. McLain*, 891 S.W.2d 587, 593 n. 11 (Tenn. 1994) (citing *Street v. Calvert*, 541 S.W.2d 576, 583-84 (Tenn. 1976)). After extensive analysis, the *Street* Court concluded that "the basic essential" of the doctrine of last clear chance "is that the defendant be the last wrongdoer with a reasonable opportunity to avoid the harm." *Street*, 541 S.W. 2d at 583. Here, the trial court held that Mr. Gray was the last wrongdoer with a reasonable opportunity to avoid the accident. Following Tennessee's adoption of the comparative fault model, a finding of last clear chance should not form the only basis for fault; rather it should be one of the factors in considering the relative fault of the respective parties. Although, here, the trial court made a specific finding that Mr. Gray had the last clear chance to avoid the accident, there is no indication that this finding was the sole basis of the trial court's assignment of fault. As discussed in more detail above, Messrs. Collins, Glasper, and Roten testified that Mr. Gray did not stop before attempting to cross Raleigh-Millington Road. Andy Roten further testified that, because of the line of trees, he did not have a clear view of the end of Juana Street. This evidence preponderates in favor of the trial court's finding that Mr. Gray had the last clear chance to avoid the accident. Consequently, the trial court correctly considered the fact that Mr. Gray had the last reasonable opportunity to avoid the harm in assigning the relative fault between the parties.

We next address Mr. Gray's factual assertion in his appellate brief that he was incompetent at the time of the accident. Unfortunately, the record on appeal does not support Mr. Gray's assertion. Rather, it appears that Mr. Gray's mental capacity at the time of the accident was never litigated in the trial court. Mr. Gray never requested the trial court to make a finding that he was incompetent at the time of the accident, and no such finding is contained in the record.[7] Furthermore, there is insufficient evidence in the record for this Court to make such a finding on appeal. While it appears that Mr. Gray had some level of diminished capacity, from the lack of medical information in the record and the discussions

---

[7]As noted above, a consent order was entered, and an amended complaint allowed, so that Mr. Adams could be added as next friend of Mr. Gray. This amendment was allowed "due to the belief of defense counsel that Plaintiff Robert Gray is mentally incompetent." However, the need for a next friend in pursuing this lawsuit tells us nothing about Mr. Gray's mental capacity *at the time of the accident*.

at trial, it also appears that Mr. Gray did not have an actual diagnosis. As briefly discussed above, Mr. Adams testified that Mr. Gray had attended special education classes in school and that he was unable to obtain a driver's license. Mr. Gray was apparently unable to hold a regular job but took small, manual jobs, such as cleaning parking lots for local businesses and collecting aluminum cans, to make extra money. Mr. Adams also testified that Mr. Gray would ride his bicycle approximately forty miles a day collecting cans and bringing them to salvage. Mr. Gray's primary support was from SSI; however, the medical basis for his eligibility is not contained in the record. The record does indicate that Mr. Gray was able to live by himself and take care of his own basic needs before the accident. From this sparse evidence, we are unable to determine that Mr. Gray was mentally incompetent at the time of the accident.

Even were we to assume, *arguendo*, that Mr. Gray proved that he was mentally incompetent at the time of the accident, he has failed to submit to us the legal effect such mental incompetence should have in this case. The only argument that Mr. Gray made to the trial court regarding his alleged mental capacity was in reference to Tenn. Code Ann. § 55-8-136, which we have previously determined to be inapplicable.[8] While Mr. Gray argued in his motion to alter or amend judgment and/or for a new trial that "because [p]laintiff was incompetent, it was error for the [c]ourt to assign fault to the [p]laintiff," this argument was never presented during the trial.[9] It is well settled that a motion to alter or amend does not allow a party to assert new, previously untried legal theories and arguments that were available to be argued at trial. *Bradley v. Mcleod*, 984 S.W.2d 929, 931-32 (Tenn. Ct. App. 1998); *Lockwood v. Hughes*, No. M2008-00836-COA-R3-CV, 2009 WL 1162577, at *7 (Tenn. Ct. App. Apr. 28, 2009). Furthermore, Mr. Gray failed to comply with Tenn. R. App. P. 27(a)(7), which requires all arguments in an appellant's brief to "set[] forth the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities and appropriate references to the record." A party "must thoroughly brief the issues they expect the appellate courts to consider." *Waters v. Farr*, 291 S.W.3d 873, 919 (Tenn. 2009) (citing *State ex rel. D'Amore v. Melton*, 186 Tenn. 548, 550, 212 S.W.2d 375, 376 (1948)). "This principle enables judges to be 'more confident in the results of their deliberations' because 'they have heard the issues argued by attorneys that are duty-bound to fully develop their opposing positions.'" *Waters*, 291 S.W.3d at 919 (quoting *State v. Northern*, 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and

---

[8] At oral argument, Mr. Gray's attorney, Mr. Wages, was asked to clarify his argument regarding his client's alleged mental incompetence. Mr. Wages again directed his argument to Tenn. Code Ann. § 55-8-136.

[9] Furthermore, Mr. Gray failed to provide any legal argument or citation supporting his motion to alter or amend on this issue.

dissenting)). Where, as here, the appellant has failed to make any argument addressing the issues raised, and has provided no authority supporting his allegations, that issue is waived on appeal. ***Bean v. Bean***, 40 S.W.3d 52, 55 (Tenn. Ct. App. 2000); ***Blair v. Badenhope***, 940 S.W.2d 575, 576-77 (Tenn. Ct. App. 1996).

Consequently, we make no determination as to what effect, if any, Mr. Gray's alleged mental incompetence should have on a comparative fault analysis.[10] Therefore, having

---

[10]The parties have not provided this Court with any law concerning this question, nor has our research revealed any Tennessee cases directly on point. From a review of our sister states, we discern a split of authority regarding what role, if any, an adult plaintiff's permanent mental disability should have in a comparative fault analysis. One approach disregards such a disability when considering whether a person exercised reasonable care and holds the mentally disabled person's standard of conduct to that of a reasonable person. *See* RESTATEMENT (SECOND) OF TORTS §§ 283B, 464 (1964); *see also* RESTATEMENT (THIRD) OF TORTS § 11(c) (2010). Cases taking this objective position differentiate between outright insanity, which may be taken into account, and moderate mental deficiency, which is ignored. *See e.g.* ***Worthington v. Mencer***, 96 Ala. 310, 11 So. 72, 17 L.R.A. 407 (Ala. 1892); ***Fox v. City & County of San Francisco***, 47 Cal. App. 3d 164, 120 Cal. Rptr. 779 (Ct. App. 1975); ***Hobart v. Shin***, 705 N.E.2d 907 (Ill. 1998); ***Jankee v. Clark County***, 612 N.W.2d 297 (Wis. 2000). Language to this effect can be found in ***Eckerd's Inc. v. McGhee***, 86 S.W.2d 570, 575 (Tenn. Ct. App. 1935), in which we held that, before the plaintiff could recover from the defendant for negligently selling her the poison with which she attempted suicide, the plaintiff would need to show that, at the time of the sale, her reason and memory "were so far obscured that she did not know and understand what she was doing, and was, therefore, not a responsible human agency." We note that the gravaman in ***Eckerd's*** was causation, as opposed to fault, and that it was decided well before the adoption of comparative fault in Tennessee.

The second approach favors the use of a subjective, capacity-based standard when analyzing the contributory negligence of a mentally challenged plaintiff. *See* W. Keeton, D. Dobbs, R. Keeton, D. Owen, <u>Prosser and Keeton on the Law of Torts</u> § 32, 178 n. 39 (5th ed. 1984). This standard tolerates a reduced standard of care for such persons and measures a plaintiff's conduct in light of his or her capacity. This more compassionate, subjective model, allows that a diminished mental capacity, not amounting to outright insanity, may still be taken into consideration when determining whether a plaintiff has exercised the requisite degree of care for his or her own safety. *See* ***Baltimore & P.R. Co. v. Cumberland***, 176 U.S. 232, 238 (1900) (holding that in determining the existence of contributory negligence, it was not to "hold the plaintiff liable for faults which arise from inherent physical or mental defects or want of capacity to appreciate what is and what is not negligence, but was only to hold him to the exercise of such faculties and capacities as he was endowed with by nature for the avoidance of danger"); ***Snider v. Callahan***, 250 F. Supp. 1022, 1023 (D.C. Mo. 1966) (holding that "under Missouri law[,] mental deficiency may avoid what would otherwise be contributory negligence in a normal person"); ***Emory Univ. v. Lee***, 104 S.E.2d 234, 249 (Ga. Ct. App. 1958) (finding that the plaintiff, who had become delirious while a patient in the defendant's hospital and was injured in a fall from a window thereof, was required to exercise that care which "every person, in his physical and mental condition, would have exercised"); ***Lynch v. Rosenthal***, 396 S.W.2d 272, 278 (Mo. Ct. App. 1965) (holding that the question of contributory negligence of mentally handicapped plaintiff was one for the jury); ***Feldman v. Howard***, 214 N.E.2d 235, 237 (Ohio Ct. App. 1966) (holding that

(continued...)

determined above that the trial court correctly found that Mr. Gray was negligent *per se* (for disobeying the stop sign and/or for failure to otherwise yield to the Raleigh-Millington Road traffic, and not for failure to use a crosswalk), and that Andy Roten was not speeding, or otherwise violating any traffic laws, we conclude that the evidence does not preponderate against the trial court's finding that Mr. Gray was at least sixty percent at fault in this accident. For the foregoing reasons, we affirm the order of the trial court, finding that Mr. Gray was sixty percent at fault in this accident, and dismissing his case. Costs of this appeal are assessed against the Appellant, Robert D. Gray, and his surety.

_____
J. STEVEN STAFFORD, JUDGE

[10](...continued)
accountability of mentally deficient plaintiff for her actions at time she was struck by motorist while crossing the street in poorly lit area not at or near crosswalk was a question for the jury), *rev'd on other grounds*, 226 N.E.2d 564 (Ohio 1967)); *see also **DeMartini v. Alexander Sanitarium***, 192 Cal. App. 2d 442, 13 Cal. Rptr. 564 (1961); ***Noel v. McCaig***, 258 P.2d 234 (Kan. 1953); ***Stacy v. Jedco Constr. Inc.***, 457 S.E.2d 875 (N.C. Ct. App. 1995).

In this appeal, Mr. Gray has not proven that he was mentally incompetent at the time of the accident or presented any argument that his alleged mental incompetence should be a factor in a comparative fault analysis; therefore, we do not address the issue and make no comment as to which approach Tennessee would follow.